**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4705
_____

GOVERNMENT OF THE VIRGIN ISLANDS

v.

ASWA MILLS,
             Appellant
_____

On Appeal from the District Court of the Virgin Islands
(D.V.I. No. 3-02-cr-00157-001)
District Judges: Honorable Curtis Gomez, Honorable
Raymond Finch, and Honorable Harold Willocks (Judge of
the Virgin Islands Superior Court, sitting by designation)
_____

Argued: December 8, 2015

Before: FISHER, KRAUSE, and ROTH, *Circuit Judges*

(Opinion Filed: April 12, 2016)

Jennifer L. Augspurger
Elliot Davis

Irma Industrious
Kimberly L. Salisbury
Pamela R. Tepper
Su-Layne U. Walker (Argued)
Office of Attorney General of Virgin Islands
Department of Justice
34-38 Kronprindsens Gade
GERS Complex, 2nd Floor
St. Thomas, VI 00802

*Attorneys for Plaintiff-Appellee Government of the Virgin Islands*

Joseph A. DiRuzzo, III (Argued)
Jeffrey J. Molinaro
Fuerst Ittleman David & Joseph
1001 Brickell Bay Drive, 32nd Floor
Miami, FL 33131

*Attorneys for Defendant-Appellant Aswa Mills*

_____

## OPINION OF THE COURT
_____

KRAUSE, Circuit Judge.

Appellant Aswa Mills was convicted in the Virgin Islands Territorial Court[1] of two counts of first-degree

_____

[1] The Virgin Islands Territorial Court is now known as the Virgin Islands Superior Court.

murder, one count of attempted robbery, and two weapons offenses. A three-judge panel of the District Court for the Virgin Islands affirmed his convictions on appeal. *See United States v. Mills*, 3:02-cr-157, 2013 WL 6072020 (D.V.I. Nov. 14, 2013) (per curiam). On appeal to this Court, Mills argues that his right to due process was violated by prosecutorial misconduct; that the trial court's jury instructions regarding self-defense were fatally flawed; and that his trial counsel provided ineffective assistance. While we agree with Mills that the prosecutors engaged in serious misconduct, we conclude that this misconduct did not render his trial fundamentally unfair and that his other claims do not warrant relief on appeal. We therefore will affirm the District Court.

## I.     Jurisdiction

The District Court had jurisdiction under 48 U.S.C. § 1613a(a). We have jurisdiction under 48 U.S.C. § 1613a(c) and (d). *See generally Gov't of the V.I. v. Davis*, 561 F.3d 159, 160 n.2 (3d Cir. 2009).

## II.     Facts and Procedural History

On January 13, 2000, the victim, Boniface Clement, was shot and killed in front of his home. Mills was arrested for the killing soon thereafter and charged in Virgin Islands Territorial Court with six counts. Counts 1 and 2 charged first-degree murder on premeditation and felony murder theories, respectively. *See* V.I. Code Ann. tit. 14, §§ 921, 922(a)(1), (2). Count 3 charged the carrying of a dangerous or deadly weapon with the intent to use it against another. *See* V.I. Code Ann. tit. 14, § 2251(a)(2)(B). Count 4 charged attempted robbery, *see* V.I. Code Ann. tit. 14, §§ 331, 1862(1), as did Count 5, *see* V.I. Code Ann. tit. 14, §§ 331,

3

1862(2). Count 6 charged the unlawful carrying of a firearm during the commission of a crime of violence. *See* V.I. Code Ann. tit. 14, § 2253(a). At trial, Mills took the stand and offered a justification of self-defense. The jury nonetheless convicted Mills of all but Count 4.

The Government's case at trial included witness and expert testimony, as well as forensic evidence. The first witness was Michael Caines, who was a truck driver for a gas company. Caines testified that, at Mills's request, he gave Mills a ride to the Contant area of St. Thomas and dropped him off two houses away from where Clement lived. He did not know why Mills wanted a ride to Contant, but he testified that Mills asked him "not to tell [Mills's] father that I had seen him or I had given him a ride." J.A. 182:17-20.

What transpired next was adduced at trial through the testimony of two eyewitnesses, Clement's wife and brother. Clement's wife testified that just before the killing, she was inside their home, talking to Clement about her car while he was outside feeding his dog. Her husband stepped inside, and she then heard someone speak to him. She asked Clement who it was, and he responded that it was "some dude who come up to my door." J.A. 246:3-6. She heard the man repeatedly say "give it to me," J.A. 246:7-12, and Clement respond "[w]hat I have for you? I have nothing for you. Get down on my step," J.A. 246:13-16. Clement repeatedly called the man "Aswa." J.A. 246:17-23. When Clement's wife looked outside, she saw Mills aiming a gun at her husband's chest. Clement grabbed Mills, Mills grabbed Clement, and they fell down the steps. Clement's wife initially testified that she saw a gunshot, but later clarified that she heard that first gunshot while she went inside to grab a bat to help her husband. When she went back outside, she

4

saw Mills, who was standing over her husband, shoot him a second time. According to her testimony, Clement's wife never saw her husband in possession of the gun, nor did she know why Mills had approached him.

Clement's brother testified that when the killing occurred, he was frying fish at his mother's house, which was also near Clement's home. He heard Clement repeatedly say "Aswa, cool out. Stop it. I'm not giving you anything." J.A. 195:16-20. About 30 seconds later, he heard a gunshot and looked outside, where he saw Mills—gun in hand—wrestling with Clement. The two fell, and as Mills was getting up, he shot Clement twice. Mills, still holding the gun, fled. Clement's brother heard Clement scream, "I'm going to die right here in my yard," before he died where he lay. J.A. 235:2-9. Clement's brother never saw Clement in possession of the gun, nor did he know what Clement and Mills were arguing about. He did, however, testify that his brother often "cut grass for other people . . . so he always have cash in his pocket." J.A. 238:5-10.

Soon after the shooting, a taxi driver in the area who was tuned in to the police channel spotted Mills jumping out of the back of a moving pickup truck, "running" and "ducking" between parked cars before running into some trees as though he was trying to hide. The driver called 911, and the police quickly located Mills, who emerged from the bushes, wearing no shoes. After his arrest, Mills waived his right to remain silent and his right to counsel. He then gave a statement to the police in which he asserted that just before his arrest, the wind blew $10 in cash and fonta leaf[2] out of his hand and that he was looking for them in the bushes when the

_____

[2] Mills testified that fonta is tobacco.

5

police arrested him. The police recovered neither the cash nor the fonta. Mills also told the police that he had not been in the victim's neighborhood that day, that he had not been in a fight that day, that he did not shoot a gun that day, and that he did not know Boniface Clement.

The physical evidence introduced in the Government's case-in-chief told a very different story. At the crime scene, the police had found an abandoned pair of shoes on the ground and over $1,000 in cash on Clement's body. In addition, Mills's hand after his arrest tested positive for gunshot residue, proving he was near a discharging firearm or handled ammunition. The gun used in the shooting apparently was never recovered.

A medical examiner also testified at trial. His autopsy revealed that Clement was shot twice. One bullet entered above his left hip, traveled downwards, and was found in in his right foot, consistent with Clement being shot while standing or sitting. The other bullet entered his abdomen, traveled downwards from front to back and left to right, and was recovered in Clement's pelvic bone. The trajectory of this round, according to the medical examiner, was also consistent with him sitting, lying down on his back, or possibly standing when shot. Both trajectories were inconsistent with the gun being pointed upwards or perpendicular to Clement at the time of discharge. Further, based on the absence of gunpowder residue and soot around the gunshot wounds, the medical examiner concluded that both shots were fired from at least two or three feet away.

After the Government presented this evidence, Mills took the stand in his own defense and offered a far different account of events than his post-arrest statement. He

acknowledged that he asked Caines, the truck driver, to take him to the victim's neighborhood, but claimed he did so to retrieve his Vise-Grip from a man he knew only as "Seala." Seala was never produced by the defense, and Mills offered no additional explanation for why he needed his Vise-Grip or was seeking it from Seala. Mills admitted that he was not sure that Seala actually lived in the neighborhood but said he thought that Seala "hangs out" there. J.A. 618:15-21. Mills further testified that he told Caines not to tell Mills's father about the ride because his father was Caines's boss and Mills believed his father would be upset that Mills got a ride in a company truck. Mills too had been employed at his father's gas company, but had been "discharged," J.A. 639:13-15, and was unemployed at the time of the shooting. Nevertheless, he claimed to have had $1,000 in his possession when he went searching for Seala. Mills also acknowledged at trial that he knew Clement and had played basketball with him.

On direct examination, Mills testified that, as he was searching for Seala, he saw Clement out in his yard, and Clement signaled him over. When he told Clement that he was looking for Seala and had $1,000 and he showed Clement a "li'l drill," J.A. 625:7-17, Clement responded that he was selling tools—which Mills understood to mean "a tool . . . that you use to fix machinery with"—and told Mills to follow him.[3] J.A. 625:15-17; 628:22-629:3. Mills asserted that they then went to Clement's house where Clement stepped inside, grabbed a gun from behind the door, and said "don't go, give me everything." J.A. 626:2-21.

---

[3] The jury heard a detective testify that "tool" is slang for gun. J.A. 608:25-609:7.

At that point, Mills testified, he believed Clement "was going to rob me," J.A. 629:10, so he grabbed the gun and tried to rip it from Clement's hands, and Clement "started bawling" and saying "cool out, cool out," J.A. 629:19-630:9. Mills alleged that he eventually gained possession of the gun because he was "kinda bigger than" Clement. J.A. 630:9. Mills then held the gun at his side briefly, told Clement to "cool out," and then offered to give the gun back "so [Clement] could cool out," but Clement did not take it. J.A. 631:12-25. Only minutes later, however, Mills testified that Clement had pointed the gun at him and, therefore, Mills thought that if Clement "got that gun he might have killed me." J.A. 633:21-634:7. On cross-examination, Mills testified that he was afraid that Clement was going to hurt him with the gun, but he made no mention of offering to give the gun back to Clement.

Mills further explained that Clement "was saying like, something, go down . . ., and I just started backing up off the stairs." J.A. 632:9-12. Mills allegedly got "halfway through the yard"—and was still in possession of the gun—when Clement "run off the stairs and attack me." J.A. 632:12-15. By Mills's account, Clement then "ran down in the yard . . . look like he pick up something off the ground, grab me by my arm with the gun, grab my shirt, like my neck, like he was trying to choke me, and I try to get away from him." J.A. 632:19-24. At that point, Mills said, "I felt scared. I felt overpowered and forced," J.A. 695:24-25, and "I feel like that I was being beat up on," J.A. 696:4-5. Mills acknowledged that the gun discharged twice when it was in his hand, but he denied shooting Clement.

After the gun fired, according to Mills, both of them fell. Mills then got up, picked up the gun, and fled through a

shortcut near a school, where he dropped the gun and drill somewhere along the route. The $1,000 that Mills testified he had in his possession when he encountered Clement was not on his person when he was arrested and, according to Mills, "[j]ust disappeared" between the killing and his arrest; he offered that it must have "fell out my pocket" during the struggle with Clement. J.A. 681:2-9.

Mills admitted that after the shooting, he fled and then gave a false statement to police, but he claimed that he was "in panic," J.A. 637:18-19, "[b]ecause I was so scared, and I know that it would only be time I would have to tell anybody anything about the situation is in court." J.A. 638:14-17. When cross-examined about his statement to the police that he lost $10, not $1,000, Mills initially responded that he "wouldn't know" if $10 is "more valuable than" $1,000 and then that $10 "could be" more valuable than $1,000 "[d]epending on [the] situation." J.A. 682:6-683:3. Mills also testified that he denied knowing Boniface Clement because he knew the victim only as "I." The jury convicted Mills on all counts but the attempted robbery charged in Count 4.

Following his conviction, Mills appealed to the District Court, raising three claims relevant to this appeal.[4]

---

[4] Mills raised a sufficiency of the evidence claim in the District Court, which that court rejected and which Mills did not appeal. *See Mills*, 2013 WL 6072020, at \*3-5. Mills also argued, and the District Court found, that in his closing, the prosecutor improperly vouched for the witnesses and mischaracterized the forensic examiner's testimony. Mills does not press these issues on appeal, however, and they therefore are waived. *See, e.g.*, *United States v. Albertson*,

First, he argued that the prosecutors engaged in misconduct that violated due process, namely: (1) repeated suggestions that the jurors could not be safe in their homes if Mills was free; (2) repeated references to the possibility that the gun Mills discarded would endanger schoolchildren and the community; and (3) the display throughout closing argument of a gruesome crime-scene photo of the victim's corpse. Second, he argued that the self-defense jury instructions were improper and required reversal. Third, Mills claimed that he received ineffective assistance of counsel.

The District Court affirmed Mills's conviction. Although the District Court agreed that the prosecutors' conduct was improper and that the jury instructions were deficient, it held there was no prejudice. *See Mills*, 2013 WL 6072020, at *6-9. The District Court also rejected Mills's ineffective assistance claim because the record was not sufficiently developed. *Id.* at *10. This timely appeal followed.

---

645 F.3d 191, 195 (3d Cir. 2011). The District Court also agreed with Mills that the prosecutors improperly elicited victim impact testimony from the victim's wife. *Mills*, 2013 WL 6072020, at *6-7. Mills mentions in passing that this testimony was "wholly inappropriate," but he does not argue that it violated due process. Appellant's Br. at 29 n.7. That argument therefore is also waived. *See John Wyeth & Bros. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("[A]rguments raised in passing (such as, in a footnote), but not squarely argued, are considered waived."). These additional facts would not alter our conclusion in any event.

## III.  Discussion

On appeal, Mills argues that prosecutorial misconduct violated his right to due process; that the trial court's jury instructions concerning self-defense were fatally flawed; and that his trial counsel was ineffective for failing to object to the jury instructions.  We address each argument in turn and conclude that there is no basis to overturn Mills's conviction.

### A.  Due Process Claim

The Fifth Amendment's Due Process Clause secures a defendant's right to a fair trial.  *See United States v. Liburd*, 607 F.3d 339, 343 (3d Cir. 2010) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).[5]  When confronted with a claim that a prosecutor's remarks violated this right, we first determine whether those remarks constituted misconduct. *See United States v. Berrios*, 676 F.3d 118, 134-36 (3d Cir. 2012); *United States v. Lee*, 612 F.3d 170, 194 (3d Cir. 2010). If so, we proceed to determine whether that misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987), taking into account "the entire proceeding," *Liburd*, 607 F.3d at 344 (quoting *United States v. Morena*, 547 F.3d 191, 194 (3d Cir. 2008)).

---

[5] The right to due process has "been extended to the Virgin Islands" by the Virgin Islands Revised Organic Act, 48 U.S.C. § 1561.  *See Liburd*, 607 F.3d at 343; *see also Davis*, 561 F.3d at 163 n.3.

11

Where, as here, a defendant did not object to prosecutorial misconduct at trial, we review for plain error. Under this standard of review, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "[I]n the ordinary case," an error affects substantial rights when "it 'affected the outcome of the [lower] court proceedings.'" *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quoting *Puckett v. United States*, 556 U.S. 129, 135 (2009)) (discussing Federal Rule of Criminal Procedure 52); *see also Fahie v. People*, 59 V.I. 505, 511 (2013) (applying the plain error standard from *Marcus* to a local Virgin Islands case). If these conditions are met, we "may exercise [our] discretion to" remedy the error, "but only if . . . the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Johnson*, 520 U.S. at 467 (internal quotation marks omitted) (quoting *Olano*, 507 U.S. at 732). For the reasons set forth below, we conclude the misconduct was plain—that is, it was "clear" and "obvious," *Marcus*, 560 U.S. at 262; *see infra* Section III.A.1, but that the error did not affect the outcome of the trial and therefore did not affect Mills's substantial rights, *see infra* Section III.A.2.

## 1. Prosecutorial Misconduct

We start with the question of whether the prosecutors' actions amounted to misconduct. In Mills's case, the prosecutors (1) argued that the jurors' own safety depended upon convicting Mills; (2) suggested that the gun Mills discarded would endanger schoolchildren and the community; and (3) throughout at least its rebuttal argument at closing,

12

displayed a graphic crime scene photograph of Clement's body.

### i.     References to the Jurors' Safety

Recognizing the pathos of Clement's last words as he lay dying in front of his home, the prosecutors throughout their opening and closing statements made references to the sanctity of the home.  The opening started off unobjectionably when the prosecutor told the jury "[i]t is 3:40, everyone in this courtroom wants to go home 'cause home is a safe place.  It's a home sweet home.  There's no place like home.  We have our house there, it's comfortable, we feel safe at home."  J.A. 163:3-8.  But the prosecutor began to veer off course when, instead of steering the narrative to what transpired at Clement's home, he admonished the jury to consider the safety of their own: "[Y]ou want to get home.  But let me tell you how home sweet home and there's no place like home can be ruined.  It can be ruined by Aswa Mills."  J.A. 163:10-14.

The prosecutor continued in this vein: "Home sweet home, there's no place like home unless you have a Aswa Mills who come into your house," J.A. 164:19-21, and "Aswa Mills.  Home sweet home, we all want to go home.  We want to have the stickiness of a murder, hearing about a murder by this defendant, that's what we here for.  Home sweet home." J.A. 167:7-11.  The prosecutor then expressly linked the jurors' own safety to their verdict:

> Home sweet home.  We have to draw a line in
> the sand.  We got to be safe at our homes.  It's
> not enough just to lock the door, check that the
> windows are closed.  *We got to stop these Aswa*

13

> *Mills from coming to our home and ruining our lives*. There's no place like home. You remember the Wizard of Oz, Dorothy, clicking her heals [sic]. No, place like home. There's no place like home. We have to be safe in our homes.

JA 171:22-172:7 (emphasis added). He concluded his opening by suggesting that the jurors should secure their own safety by returning a guilty verdict: "First degree murder, possession of a gun, and robbery, there has to be a place like home. We all want to go home. We have to be safe at our homes. First degree murder, possession of an unlicensed gun and robbery. Thank you." J.A. 172:17-23.

This theme continued during the closing argument as the prosecutor said, for example, that Mills:

> murdered [the victim] and he ruined his entire home. He ruined the home of his wife []. He ruined the home of his three kids . . . . He ruined the home of his brother [], and his mother. He ruined an entire family's home. No more home sweet home.

JA 727:12-19. The prosecutor made similar comments toward the end of the rebuttal closing, observing ominously, "[i]t's a very ugly case. Someone's home is torn totally upside down, and we know everyone wants to get home today." J.A. 800:12-15.

We conclude that these comments went beyond factual description or even legitimate thematic use of the home and constituted misconduct. We have previously criticized such

14

"Golden Rule arguments," observing that "the propriety of 'put yourself in the defendant's shoes' argument, as a tool of advocacy, is doubtful because it 'encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *Edwards v. City of Phila.*, 860 F.2d 568, 574 (3d Cir. 1988) (quoting *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir. 1982)). The same concerns abide when an advocate asks the jury to put itself in the victim's shoes. Thus, prosecutors commit misconduct when they "urge jurors to identify individually with the victims with comments like 'it could have been you' the defendant killed or 'it could have been your children,'" *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009) (quoting *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008)), or when they "fan the flames of the jurors' fears by predicting that if they do not convict, a crime wave or some other calamity will consume their community," *id.* Yet here, the prosecutors did just that by repeatedly suggesting that the jurors themselves were not safe in their homes as long as Mills was at large.

While prosecutors are not foreclosed from making effective use of themes, metaphors, and references to popular culture, they may not cross the line and invite the jury to render a decision on grounds of bias, passion, prejudice, or sympathy. As even the Government appropriately acknowledged at oral argument, that line was crossed here. Oral Arg. at 19:50 (argued December 8, 2015).

### ii.     The Missing Gun

The prosecutors also capitalized on the fact that the police never recovered the gun that Mills tossed near a school by emphasizing the danger that Mills had created for the

15

community. During the opening statement, for example, the prosecutor stated, "[t]here's a gun out there people. It's a gun, it's an instrument of death, it has a body on it." J.A. 167:4-6. Toward the end of the opening, he remarked, "[a]nd then we have a gun. The gun is gone. This defendant had enough time to get rid of the gun. Anybody can have this gun. Instrument of death." J.A. 172:7-11.

During its cross examination of Mills, although Mills had already acknowledged on direct that he dropped the gun in the course of his flight, the Government specifically elicited that Mills dropped the gun near a school. Then, during closing, the prosecutor argued:

> He didn't know where he threw [the gun] away, but ladies and gentleman, in that same area are not one, but two schools, two schools where innocent little kids walk and travel that path. They live in that area. They travel that area all the time.

> That gun is out there. What if one of them finds that gun that he so casually threw away? What if one of them finds that gun and accidentally shoot one of their friends or some relative? That gun has one body on it. It already ruined one home. Now it's out there potentially to ruin somebody else's home.

JA 734:1-14. And again, in his rebuttal, the prosecutor pointed out:

> Ladies and gentleman, there's a gun somewhere in the Contant area if it hadn't been located or

16

found by some innocent person. There's two schools over in that area. There's children that travel that area. There's one dead person already associated with that gun.

JA 799:16-800:3.

This too was misconduct. Given that Mills was alleged to have shot Clement and was charged with various firearms offenses, the prosecutors had a legitimate need to elicit testimony that Mills discarded the firearm during flight to explain why it was not on his person when he was arrested and was never recovered. But the ongoing threat to schoolchildren created by the discarded gun, however reprehensible, was not relevant to the particular crimes with which Mills was charged. Raising this specter, therefore, was purely "inflammatory," as the Government to its credit also conceded at oral argument. Oral Arg. at 21:40.[6]

### iii. The Use of Clement's Photo During Closing

The third category of alleged misconduct at issue is the prosecutors' display of a crime-scene photograph of Clement's corpse throughout at least the Government's rebuttal closing.[7] This photograph shows Clement's dead

---

[6] Curiously, the Government did not concede that the comments were error.

[7] The District Court stated that "[t]he prosecutor projected a photo of [the victim], during the entirety of his closing argument." *Mills*, 2013 WL 6072020, at *8. From the trial transcript, however, it appears that the photo was

17

body, prone and bloody, at the scene of the shooting.[8]  The trial court characterized the photo as "the one of the deceased defendant shot."  J.A. 803:1-2.  Of all the photos that had been admitted into evidence, it was, according to the trial court, "the one that [was] gonna provoke the most sympathy."  J.A. 802:13-14.  Indeed, the trial court noted that the jury had been looking at it "all the time" while it was displayed.  J.A. 803:12-17.  At the conclusion of the rebuttal closing, the trial court, outside the presence of the jury, expressed its "burning curiosity" as to why the photo was displayed during closing argument when the prosecutor never once made reference to it.  J.A. 801:6-21.  The prosecutor's response was telling: "[t]o provoke sympathy."  J.A. 802:1-2.

The display of a photo of this nature for this admitted purpose also constituted misconduct.  Indeed, in *Berrios*, we found misconduct based on the display of a far less inflammatory photo.  There, the Government displayed a puzzle of the victim's face, ostensibly to dramatize "how disparate pieces of evidence fit together."  676 F.3d at 135.  In rejecting this justification and finding that there had been

---

displayed during the Government's rebuttal closing; the transcript does not indicate whether the photo was displayed during the Government's initial closing argument.

[8] Although not expressly stated in the record, we have no trouble identifying the photo in question as Exhibit 11 in light of the trial court's description.  At oral argument, the Government offered to confirm whether the photo displayed was indeed Exhibit 11 but never made a supplemental submission.

18

misconduct, we reasoned that "there was no such conceivable purpose in using an enlarged photograph of the victim's face as the puzzle image," and "such conduct should not have been allowed in court." *Id.* Likewise, there was no reason to display the photo here other than—as expressly stated by the prosecutor—to provoke sympathy. Because such "appeals for jurors to decide cases based on passion and emotion [arising from sympathy for the victim are] improper," *Moore v. Morton*, 255 F.3d 95, 117 (3d Cir. 2001), the prosecutor's display of the photo in this case also rose to the level of misconduct. [9]

Having considered the prosecutors' actions and the relevant case law, we conclude that these tactics, individually and collectively, did constitute misconduct.[10] *See, e.g.,*

[9] As is apparent from the trial court's colloquy with the prosecutors following closing arguments, the trial court recognized the impropriety of the use of the victim's photo even as it was being displayed but took no action because there was no objection. The court noted, though, that it would do something "next time." J.A. 802:3-6. Mills's counsel told the trial court that he "started to object" to the photo but "didn't want to interrupt." J.A. 802:7-8. The preferred course in these situations is of course for defense counsel to object, but even in the absence of an objection, a trial court that recognizes prosecutorial misconduct taking place at trial can and should preserve the integrity of the proceedings by intervening sua sponte if necessary.

[10] In holding that the prosecutors' tactics here constitute "prosecutorial misconduct," we do not conclude, nor do we need to conclude, that the prosecutors intended to

*Berrios*, 676 F.3d at 134-36; *Lee*, 612 F.3d at 194.  We also conclude that these errors were plain—that is, they were clear or obvious.  *See Marcus*, 560 U.S. at 262.  We therefore proceed to consider their effect on the fairness of the trial.

## 2.    Analysis

Having found that the prosecutors in Mills's case engaged in prosecutorial misconduct, we next consider whether the error affected Mills's substantial rights and the fairness and integrity of the proceeding, an inquiry in this case that is closely aligned with the Due Process inquiry of "whether the misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process in light of the entire proceeding."[11]   *Liburd*, 607 F.3d at 344

---

commit misconduct or acted in bad faith.  "The critical question in assessing constitutional error is to what extent a defendant's rights were violated, not the culpability of the prosecutor. . . .  A prosecutor's deliberate acts might have no effect at all upon the trier of fact, while acts that might be inadvertent could serve to distract the jury from its proper task and thus render a defendant's trial fundamentally unfair."  *Marshall v. Hendricks*, 307 F.3d 36, 68 (3d Cir. 2002).  Prosecutors, however, serve in positions of public trust, and must guard against the temptation to draw on jurors' passions instead of the evidence, particularly in the heat of trial.

[11] We have taken inconsistent approaches as to where in the analysis of a *Donnelley* claim we review for harmlessness.  In some cases, we have conducted a two-step inquiry, subsuming the harmless error inquiry within our inquiry into whether the misconduct resulted in an unfair trial.  *See, e.g.*, *Berrios*, 676 F.3d at 134-36; *Liburd*, 607 F.3d at

(quoting *Morena*, 547 F.3d at 194); *cf. Marcus*, 560 U.S. at 262 (explaining that an error ordinarily affects substantial rights when it "affect[s] the outcome of the [lower] court

342.    In others, we have espoused a three-step approach, "not[ing] that we only conduct a harmless error inquiry once we decide that constitutional error did occur.  Thus, we first examine whether the misconduct so infected the trial as to render it unfair." *Marshall*, 307 F.3d at 67 n.16.  At least on direct review, however, the two-step inquiry will suffice because the harmless error standard of *Chapman v. California*, 386 U.S. 18 (1967), "is more demanding than the 'fundamental fairness' inquiry of the Due Process Clause." *Greer*, 483 U.S. at 765 n.7.  Thus, if the reviewing court determines that prosecutorial misconduct rises to the level of a due process violation, then *a fortiori* the misconduct is not harmless under *Chapman*.  *Id.* at 765 & n.7.  If, on the other hand, the court determines the misconduct does not rise to the level of a due process violation, it has no occasion to undertake a harmless error review under *Chapman*, but may nonetheless exercise its supervisory powers to reverse a conviction if "it is *highly probable* that the error did not contribute to the judgment," *United States v. Zehrbach*, 47 F.3d 1252, 1265 (3d Cir. 1995) (en banc) (quoting *Gov't of the V.I. v. Toto*, 529 F.2d 278, 284 (3d Cir. 1976)), considering "the scope of the objectionable comments and their relationship to the entire proceeding, the ameliorative effect of any curative instructions given, and the strength of the evidence supporting the defendant's conviction, *id.*  Mills has not sought to invoke our supervisory powers and, in any event, their exercise is not warranted here for the reasons set forth in this Section.

proceedings" (quoting *Puckett*, 556 U.S. at 135); *Johnson*, 520 U.S. at 469-70 (explaining that an "error did not 'seriously affect[] the fairness, integrity or public reputation of judicial proceedings'" because there was "overwhelming" evidence supporting the conviction (quoting *Olano*, 507 U.S. at 736). In making this determination, we consider the misconduct "in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." *Lee*, 612 F.3d at 194 (quoting *Moore*, 255 F.3d at 107).

In applying these factors here, we must situate the prosecutorial misconduct in this case on the continuum established by our precedent. At one end sits *Berrios*. There, several defendants were convicted of charges stemming from a "series of carjackings, an attempted robbery, and the murder of a security guard." 676 F.3d at 123. During closing, the Government read a poem commemorating the guard, presented a large photograph of his face as a puzzle "to show the jury how disparate pieces of evidence fit together," *id.* at 135, and briefly referred to a defendant's time in jail, *id.* at 134. We held that, although "the closing was rife with misconduct," the errors in the closing did not "merit reversal" for several reasons. *Id.* at 135. First, the misconduct was not pervasive: the poem "was a mere ten lines out of over seventy-five pages of closing argument," while the picture was displayed briefly and had already been admitted into evidence. *Id.* Second, the court had twice instructed the jury not to be swayed by bias, which "sufficiently removed any lingering prejudice." *Id.* at 135-36 & n.10. Third, "the jury was presented with ample evidence on which it could convict the defendants," *id.* at 136, including a wiretap in which two

22

defendants admitted to the crime and implicated another co-conspirator, *id.* at 124.

At the other end of our continuum sits *Moore*, in which we granted a state inmate's habeas petition challenging his rape and robbery convictions due to prosecutorial misconduct. 255 F.3d at 97, 120. That case turned on the identity of the rapist, and the white victim was only able to identify the black defendant after being hypnotized. *Id.* at 109-10. During closing, the prosecutor argued that the jury could infer that the defendant had a "preference" for white women because his wife was white, *id.* at 116, and that the defendant needed "sexual release" at the time of the rape because his wife was then ill, *id.* at 100-01. Finally, he told the jury that "if you don't believe [the victim] and you think she's lying, then you've probably perpetrated a worse assault on her." *Id.* at 101. We reversed, holding that the "sexual release" comment was cured by the trial court's instructions but that even the trial court's "strong" and specific instructions were insufficient to cure the prejudice caused by the race-based "preference" and the "perpetrate a worse assault" comments taken together. *Id.* at 115-18. Further, the "perpetrate a worse assault" comment improperly played to the jury's emotions and buttressed the victim's credibility and reliability when her identification of the defendant was crucial to the prosecution's case. *Id.* at 118. This comment, we held, when combined with the "preference" comment, resulted in prejudice that implicated due process concerns. *Id.* Finally, the Government's case lacked any "strong physical, circumstantial, testimonial, or corroborating identification evidence linking [the defendant] to the rape." *Id.* at 119.

Against this backdrop, we now consider in Mills's case the severity and pervasiveness of the misconduct, the curative instructions, and the strength of the evidence. For the reasons set forth below, we conclude, on balance, this case is more like *Berrios* than *Moore* and the errors neither warrant relief under the plain error doctrine nor rose to the level of a due process violation.

### i. The Severity and Pervasiveness of the Misconduct

*Berrios* and *Moore* instruct that we consider, first, the severity of the conduct and its pervasiveness—that is, the number of times or the length of time that the prosecutor engaged in misconduct. *See, e.g.*, *Berrios*, 676 F.3d at 135; *Moore*, 255 F.3d at 118.

The misconduct here was both severe and pervasive. The photo of the victim's body traded on the jurors' sympathy and was more prejudicial than the photo and poem in *Berrios*, and the prosecutors' comments from opening through closing regarding the missing gun and the jurors' safety in their homes expressly linked Mills to hypothetical acts of violence wholly unrelated to the one for which he was being tried. Moreover, the prosecutor expressly argued that finding Mills guilty of the charged offenses was the only way the jurors could be safe in their homes. The severity and pervasiveness of the misconduct thus more closely resemble that of *Moore*, where the prosecutor relied on race-based arguments to secure a conviction, and weigh in favor of Mills.

### ii. Curative Instructions

24

Second, we consider the effect of the curative instructions, if any. *Lee*, 612 F.3d at 194. The more severe the misconduct, the less effective the curative instructions—particularly when the curative instructions are not given immediately after the misconduct or when they do not direct the jury to ignore specific instances of misconduct. *Compare Morena*, 547 F.3d at 197 (holding that a trial court's instruction reminding the jury that the defendant was not on trial for drug offenses did not cure the prejudice from evidence concerning the defendant's drug use and dealing because it was "hardly a specific direction to disregard the drug evidence"), *with Zehrbach*, 47 F.3d at 1267 (finding that the trial court cured a prosecutor's improper vouching when it immediately "gave a specific instruction to disregard the prosecutor's comment").

The trial court here instructed the jury before and after the evidence was presented that the case must be decided based on the evidence, that the lawyers' statements and arguments are not evidence, and that the jury was responsible for determining each witness's credibility. The court also instructed the jury after the evidence was presented that "the law does not permit you to be influenced by outside matters such as sympathy, bias, prejudice, or any other similar fact or factor for or against either side. You should not and may not be influenced . . . by . . . public policy . . .," J.A. 849:11-18, and gave a similar instruction at the beginning of the trial.

On the one hand, the trial court did not expressly admonish the jury to ignore the specific instances of misconduct. *See Morena*, 547 F.3d at 197. On the other hand, we have held that instructions similar to those given by the trial court here or "a clear and complete jury instruction on the elements of the claim asserted and on the allocation of

25

the burdens of proof, whenever given, is sufficient to cure harm caused by a 'Golden Rule' argument" asking the jurors to put themselves in another's shoes. *Edwards*, 860 F.2d at 574. And more generally, it is well established that jurors are presumed to follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 206 (1987). Although the instructions were not given immediately following some of the misconduct, perhaps the most inflammatory misconduct—the display of the photograph throughout at least the rebuttal closing— occurred at the end of trial in close proximity to the instructions. *See Berrios*, 676 F.3d at 135-36; *see also Zehrbach*, 47 F.3d at 1267. Though a close question, we conclude that this factor tilts against Mills.

### iii.     The Strength of the Evidence and Mills's Defense

Next, we consider the strength of the evidence against the defendant and, when the Government's case or the accused's defense turns on witness credibility, how the misconduct might have affected the jury's credibility determination. *See Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (finding no due process violation by improper comments in part because the evidence against the defendant was "overwhelming"); *Berrios*, 676 F.3d at 136 (finding no due process violation where "the jury was presented with ample evidence on which it could convict the defendants"); *cf. Moore*, 255 F.3d at 118-19 (finding that the strength of the state's evidence was not sufficient to overcome the prosecutor's misconduct). This third factor weighs decisively against Mills and is dispositive in this case.

There was no dispute at trial concerning the identity of the shooter: Mills conceded that he and the victim engaged in

26

a struggle and that Mills had the gun in his hand when it discharged. Indeed, the central question for the jury was whether Mills acted in self-defense, as he testified, or whether he killed Clement in the course of committing a robbery, V.I. Code Ann., tit. 14, § 922(a)(2), and in a "willful, deliberate and premeditated killing," V.I. Code Ann., tit. 14, § 922(a)(1), as urged by the Government.

The Government's case was supported by overwhelming evidence that showed Mills murdered Clement in the course of committing a robbery and with premeditation. The evidence reflected that Mills was out of work and, thus, was financially strapped; that Mills knew Clement and, thus, had reason to know that he often had large amounts of cash on hand; and that Mills designed a plan to go secretively to Clement's home to rob and kill him if necessary. There was also consistent and corroborated testimony from Clement's wife and brother that Mills was in fact robbing Clement when he killed him and that, when he shot Clement, not once but twice, he did so deliberately and with intent to kill. That evidence included the wife's testimony that she heard Mills demand something from Clement and both witnesses' testimony that they heard Clement refuse to give Mills anything; the wife's testimony that just after Clement refused and before she grabbed a bat and heard a shot, Mills was pointing a gun at Clement; and both witnesses' testimony that Mills fired the second shot while standing over Clement, who was lying helpless on the ground. The forensic evidence was consistent with this testimony and supported premeditation, indicating that Clement was sitting or lying down when he was shot and that he was shot from at least two to three feet away. *See Gov't of the V.I. v. Martinez*, 780 F.2d 302, 305 (3d Cir. 1985) (holding evidence sufficient to support

conviction for premeditated murder where, among other things, the defendant shot the victim four times—once or twice at close range); *Codrington v. People*, 57 V.I. 176, 190 (2012) (holding that evidence supported premeditated murder conviction where the defendant walked away from the victim, returned, and fired a second shot).

That Mills was guilty of murder and the other crimes for which he was convicted was only reinforced by his ensuing flight, his tossing of the gun, and his lies to the police. *See Gov't of the V.I. v. Lake*, 362 F.2d 770, 776-77 (3d Cir. 1966) (holding that evidence that a defendant's statement to police following a killing, which was contradicted by other evidence, supported a finding of premeditation).

On the other hand, the only evidence that Mills acted in self-defense was his own testimony, which lacked consistency and was irreconcilable with both the testimony and the physical evidence at trial. At the threshold, Mills's general credibility as a witness was severely undermined by his admittedly false post-arrest statement that contradicted his trial testimony. *See, e.g.*, *Harris v. New York*, 401 U.S. 222, 225-26 (1971). That testimony, moreover, was itself implausible. For example, Mills's explanation that he asked to be dropped near Clement's home to retrieve his Vise-Grip from "Seala" lacked any corroboration or even context in Mills's testimony. Likewise, it defied credulity that Clement—who, according to his wife, was then feeding his dog in the backyard—beckoned Mills over and tried to rob him. Neither Clement's wife nor his brother corroborated this account, and, on the contrary, both eyewitnesses heard Mills make demands of Clement and Clement rebuff those demands, not vice-versa.

28

At other points, Mills's testimony was internally inconsistent and illogical. For example, Mills testified on both direct and cross examination that he was afraid that Clement was going to hurt him because Clement had pointed a gun at him. But Mills testified on direct examination that he took the gun from Clement and then immediately offered to *give it back* to Clement so that Clement could "cool out." J.A. 631:23-632:7. This account not only defies common sense but was conspicuously absent in Mills's cross-examination. Mills also asserted that after he backed off of Clement's stairs and was halfway through the yard, Clement rushed him—even though Mills was in possession of the gun and Clement was apparently unarmed. This too strains credulity.

Finally, Mills's testimony was directly contradicted by the forensic evidence. For instance, Mills claimed that he did not shoot Clement intentionally but, instead, that the gun in his hand somehow discharged, twice, in the course of a struggle. Clement's wife, however, saw Mills pointing the gun at her husband's chest before the first shot, and both witnesses testified that Mills delivered a second shot while standing over Clement, who was lying on the ground. The medical examiner, moreover, testified that both shots were fired from at least two to three feet away, which was consistent with the eyewitness testimony and irreconcilable with Mills's account of the shooting.

In view of the overwhelming evidence that Mills committed the offenses for which he was convicted and did not act in self-defense, and Mills's own inconsistent statements that undermined his credibility, we are convinced that it had no "prejudicial . . . impact" on "the jury's finding of guilt." *Moore*, 255 F.3d at 113; *see also Walker v. Horn*,

385 F.3d 321, 336 (3d Cir. 2004) (finding that "a substantial amount of other evidence," including the plaintiff's inconsistent statements, undermined the plaintiff's credibility such that it was "highly improbable" that the erroneous admission of impeachment evidence "had an impact on the outcome of the trial"). We conclude, therefore, that while the prosecutors in this case stepped far over the line of what is acceptable at trial, that misconduct was more than counterbalanced by the strength of the evidence and thus did not affect Mills's substantial rights, *see Marcus*, 560 U.S. at 262; *see also Darden*, 477 U.S. at 182, or render Mills's trial fundamentally unfair, *see, e.g.*, *Greer*, 483 U.S. at 765; *Donnelly*, 416 U.S. at 643.

### B. Self-Defense Jury Instruction

We turn next to Mills's argument that portions of the trial court's jury instructions concerning self-defense were erroneous. "We generally exercise plenary review in [determining] 'whether the jury instructions stated the proper legal standard,' and review the refusal to give a particular instruction or the wording of instructions for abuse of discretion." *United States v. Flores*, 454 F.3d 149, 156 (3d Cir. 2006) (quoting *United States v. Khorozian*, 333 F.3d 498, 507-08 (3d Cir. 2003)). Again, however, where, as here, there is no objection at trial, "we review only for plain error." *Gov't of the V.I. v. Fonseca*, 274 F.3d 760, 765 (3d Cir. 2001).

When reviewing a trial court's charge to the jury, "[j]ury instructions must be read as a whole." *Flores*, 454 F.3d at 157 (quoting *E.E.O.C. v. Del. Dep't of Health and Soc. Servs.*, 865 F.2d 1408, 1418 (3d Cir. 1989)); *see also Estelle v. McGuire*, 502 U.S. 62, 72 (1991) ("It is well

established that [a jury] instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). We will affirm the district court when "the charge as a whole fairly and adequately submits the issues in the case to the jury." *Fonseca*, 274 F.3d at 767 (quoting *United States v. Thayer*, 201 F.3d 214, 221 (3d Cir. 1999)); *see also United States v. Tai*, 750 F.3d 309, 316 (3d Cir. 2014). Therefore, an instruction that is "erroneous on its own may be remedied by the balance of the court's instructions." *Berrios*, 676 F.3d at 137.

In the Virgin Islands, a homicide is justifiable on self-defense grounds where (1) the defendant actually believed at the time of the killing that he "was in imminent or immediate danger of his life or great bodily harm," and (2) this belief was reasonable. *See* V.I. Code Ann. tit. 14, § 43. That is, self-defense has both a subjective and an objective prong. The Government has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *Gov't of the V.I. v. Smith*, 949 F.2d 677, 683-84 (3d Cir. 1991).[12]

---

[12] The Virgin Islands Code contains numerous statutes delineating when a homicide is justifiable or excusable. *See, e.g.*, V.I. Code Ann. tit. 14, § 41 ("Resistance by party to be injured"); V.I. Code Ann. tit. 14, § 42 ("Resistance by other parties"); V.I. Code Ann. tit. 14, § 43 ("Self-defense"); V.I. Code Ann. tit. 14, § 44 ("Justifiable use of force"); V.I. Code Ann. tit. 14, § 293 ("Lawful violence, what constitutes"); V.I. Code Ann. tit. 14, § 926 ("Excusable homicide defined"); V.I. Code Ann. tit. 14, § 927 ("Justifiable homicide defined"). In

Mills objects that the trial court's self-defense instructions did not encapsulate the principle that "self-defense hinges on the reasonableness of the defendant's subjective beliefs." Appellant's Br. at 16. Specifically, Mills points to two sentences from the Territorial Court's instructions:

> The circumstances under which a defendant acted must have been such as to produce in the mind of a reasonable prudent person, similarly situated, the reasonable belief that the other person was about to kill him or to do him serious bodily harm.

JA 830:8-13.

> [Self-]defense *hinges on* the defendant's objective belief [of] imminent danger of death or serious bodily harm are not on the objective reasonableness of the belief. Therefore, in evaluating whether the defendant's objective belief of imminent danger from Mr. Boniface Clement was reasonable, you may consider . . . .

JA 834:9-15 (emphasis added).

These statements give us pause. Considered in isolation, they minimize the importance of the defendant's

---

view of Mills's reliance on *Smith*, which discusses Virgin Islands Code title 14, section 43, we construe his challenge to be that the trial court did not properly instruct the jury as to the requirements of section 43 and tailor our discussion accordingly.

subjective belief, which was important to the question of self-defense in this case. Further, the use of the phrase "hinges on" risked focusing the jury's attention on the objective component to the exclusion of the subjective one.

However, at multiple other points during the instructions, the trial court properly instructed the jury that self-defense under § 43 has both subjective and objective prongs. For example, the court instructed:

> To justify a homicide on the ground of self-defense, there must be not only the belief but also reasonable grounds for believing that at the time of the killing . . . the party killing was in imminent or immediate danger of life or great bodily harm.

JA 828:19-829:1 (repeated almost verbatim at J.A. 829:7-13).

> If the defendant was not the aggressor and had reasonable grounds to believe and actually did believe he was in imminent danger of death or serious bodily harm from which he could have saved himself only by using deadly force . . . then he had a right to employ deadly force . . . .

JA 829:16-23.

> [T]he defendant must have actually believe he was in imminent danger of death or serious bodily harm . . . .

JA 830:14-16.

33

> [I]f the defendant had reasonable ground to believe and actually did believe that he was in imminent danger [of] death [or] serious bodily harm, and deadly force was necessary . . ., he was justified in using deadly force and self-defense even though it may afterward have turned out that the appearances were false.

JA 831:6-14 (repeated almost verbatim at J.A. 833:24-834:7). Thus, the trial court repeatedly instructed the jury as to the correct standard—that self-defense contains both an objective and a subjective prong.

In sum, while there are deficiencies in two sentences of the instructions taken in isolation, we cannot say that the instructions taken as a whole amounted to error, much less plain error. *See Flores*, 454 F.3d at 158-59 (finding no plain error where a trial court once instructed the jury, erroneously, that the defendant bore the burden of proof to disprove willful blindness, but other portions of the instructions "repeatedly imposed the burden of proving willful blindness on the Government"); *see also Tai*, 750 F.3d at 316 ("When the instructions are read as a whole, it is clear that no jury could conclude that [the defendant] bore the burden of proof as to any aspect of his knowledge and the District Court committed no error in connection with its willful blindness instruction.").

## C.     Ineffective Assistance of Counsel

Mills also alleges that his trial counsel was ineffective for his failure to object to the jury instructions. However, as a general matter, we "do[] not entertain a claim of ineffective assistance of counsel on direct appeal. Among the reasons

34

that such a claim is not usually cognizable on direct appeal is the very important fact that there will not, in the typical case, exist a record developed enough to assess the efficacy of defense counsel." *Gov't of the V.I. v. Vanterpool*, 767 F.3d 157, 163 (3d Cir. 2014) (citation omitted).

Here, we agree with the District Court that the record is not sufficiently developed because we do not have evidence of "counsel's perspective at the time of the alleged error" and cannot determine whether the failure to object was "sound trial strategy." *Id.* at 168. We therefore decline to reach Mills's ineffective assistance claim.

## IV.    Conclusion

A prosecutor "may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones." *Berger v. United States*, 295 U.S. 78, 88 (1935). The prosecutors in this case went out of bounds and the District Court, as referee, called foul. But in view of the overwhelming evidence against Mills, the sheer implausibility of his defense, and the trial court's curative instructions, this District Court properly concluded that foul did not rise to the level of a due process violation and that Mills's other claims do not warrant relief. We therefore will affirm the judgment of the District Court.