**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 15-4011
_____

UNITED STATES OF AMERICA

v.

RONALD W. REPAK,
Appellant

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 3-14-cr-00001-001
District Judge: The Honorable Kim R. Gibson

Argued: December 19, 2016

Before: SMITH, <u>Chief Judge</u>, MCKEE, and SHWARTZ,
<u>Circuit Judges</u>

(Filed: March 28, 2017)

Rebecca R. Haywood, Esq.
Laura S. Irwin, Esq.                **[ARGUED]**
700 Grant Street
Suite 4000
Pittsburgh, PA  15219
    *Counsel for Appellee*

Timothy J. Lyon, Esq.               **[ARGUED]**
Suite 1801
310 Grant Street
Pittsburgh, PA  15219
    *Counsel for Appellant*

_____


OPINION

_____


SMITH, <u>Chief Judge</u>

Ronald Repak was convicted of two counts of Hobbs Act extortion, in violation of 18 U.S.C. § 1951, and two counts of federal program bribery, in violation of 18 U.S.C. § 666.  Repak appeals his conviction and sentence on those counts.  For the reasons stated below, we will affirm.

# I

This is a public corruption case coming out of Johnstown, Pennsylvania. The defendant, Ronald Repak, was the Executive Director of the Johnstown Redevelopment Authority ("JRA"), which receives federal and state funding to assist in economic development for the City of Johnstown. A voluntary Board of Directors governs the JRA. To promote economic development in Johnstown, the JRA's Board of Directors awards contracts to remediate industrial proprieties and issues grants to attract companies to Johnstown.

While the JRA's Board of Directors ultimately confers contracts and grants, the JRA's Executive Director, who runs the day-to-day operations of the organization, makes recommendations to the Board as to which contractors should receive those contracts and grants. The JRA's Board of Directors "relied on the director to keep [them] informed as to what was going on." JA263. As one JRA Board member testified, "95 percent of what any board member [knew] in most . . . situations . . . w[as] told [to them] by the director." JA262–63. In short, the Executive Director plays a vital role in the process of selecting who receives JRA contracts and grants.

Repak was the Executive Director from November 1977 to February 2013. His assistant was Debbie Walter.

3

With Walter's help, Repak solicited a number of items from contractors who had been awarded contract work by the JRA during his time as Executive Director.[1] Repak's solicitations included requests for concert tickets, sporting event tickets, and golf outings. JRA contractors acquiesced in Repak's solicitations because "if [they] didn't, [they] felt that [they] would lose work." JA284. As one contractor testified, Repak "would sometimes . . . provide some innuendos like, 'Hey, I'm reviewing some invoice here of yours,' which [was] usually followed up with some type of request. Or sometimes, [he would say,] 'Well, I can get someone else to do the work.'" *Id.*; *see also* JA301 ("Mr. Repak provided a lot of, I said innuendos, subtle things through conversations. And then it would always be followed in a short period of time by either an instruction or request. . . . [W]ith him[,] [instructions and requests] were the same thing.").

Of particular importance in this appeal are two items that Repak received from JRA contractors but that were unassociated with any JRA project: a new roof on his house and excavating services for his son's gym. The Government also charged Repak with receipt of Pittsburgh Steelers tickets from another contractor,

---

[1] Most of Repak's solicitations were uncharged conduct admitted at trial through the District Court's contested ruling under Rule 404(b) of the Federal Rules of Evidence, which is addressed below.

4

Kimball & Co. The jury, however, acquitted Repak on the counts related to receipt of the Steelers tickets. For that reason, we discuss only the receipt of the roof and excavating services in detail.

In 2009, JRA contractor EADS Group ("EADS") replaced the roof on Repak's home at no cost to Repak. While Repak and several EADS employees were together, Repak overheard an EADS employee, Stephen Sewalk, discussing his past roofing business. Repak then asked Sewalk to take a look at the roof on his home. At that time, EADS did significant business with the JRA. Based on Repak's past solicitations for tickets and other items, Sewalk stated that he "inward[ly] sigh[ed]" following Repak's roof request and thought "here we go [again]." JA286. Although Sewalk initially tried to ignore Repak's request, Sewalk "knew it wasn't going to go away" after Repak made the request again several months later. *Id.* Sewalk then went to look at Repak's roof but testified at trial that he did not give Repak a quote for work on the roof. Rather, after Sewalk spoke with EADS's CEO, EADS "figured [the roof] was going to be another . . . favor" and informed Repak that it would cover the cost of replacing his roof. JA287. Sewalk testified that, although Repak offered to pay for the roof at one point, Repak also told him to "bury [the roofing expenses] in an invoice" to the JRA. JA288. EADS ultimately replaced the roof at a cost of $3,000 to $4,000. Instead of concealing those expenses in JRA

5

invoices as Repak instructed, EADS simply bore the cost of replacing the roof. When asked at trial why EADS did this for Repak, Sewalk responded that EADS replaced the roof simply so that EADS could "maintain the workload" with the JRA. *Id.*; *see also* JA289 ("[W]e wanted to keep people employed and do our work. So I figured if we told [Repak] no that we weren't going to be working there much longer.").

Also in 2009, a JRA contractor performed excavating services at a gym owned by Repak's son. Neither Repak nor his family paid for it. Repak initially asked another JRA contractor to do the excavating work, but, after Repak told the contractor to bury $5,000 out of the $6,000 excavating price quoted in a JRA invoice, the contractor turned him down and refused to work for the JRA again. As that contractor put it, "I just discussed it with my wife and kids, . . . and we just decided it would be better just to walk away [than continue to work for the JRA and Repak]." JA359.

Repak then enlisted another JRA contractor, L&M Excavating Company ("L&M"), to do the work. Repak instructed L&M to demolish two abandoned homes and level lots adjoining his son's gym and then to spread gravel on the leveled area for parking. This work cost L&M $17,500. After completing the requested work, an L&M employee, Rick McNulty, asked Repak whom L&M should invoice for the work. Repak told McNulty to "just bury [the $17,500] in invoices" to the JRA and

6

did not offer to pay for L&M's services. JA325–26. At that time, sixty percent of L&M's business came from the JRA. Yet, rather than follow Repak's instruction to submit fraudulent invoices, L&M assumed the $17,500 cost to level and gravel the property near the gym. When asked why L&M did this, McNulty explained that providing these gratuitous services to Repak was just "part of doing business with the [JRA] and Mr. Repak." JA311.

As members became suspicious of Repak's dealings with JRA contractors, the JRA's Board of Directors implemented policies to control gratuities and expenditures. The gratuities policy prohibited JRA contractors from offering any gratuity to any JRA employee and prohibited JRA employees from accepting the same. The expenditures policy required the approval of the JRA's Board of Directors for all JRA expenditures over $500. At trial, JRA contractors expressed the relief they felt following enactment of the gratuities policy. One JRA contractor testified, "I was relieved [because] . . . it gave me my ammunition to say no, I guess. I didn't have to continue doing this." JA290. Echoing the sentiment behind the JRA policies, another contractor opined, "It had to stop. It was getting to the point that [Repak] was like one power running everything in the city of Johnstown and if . . . this wasn't the way you would choose to do business, you wouldn't do business here." JA330.

7

## II

A grand jury returned a six-count indictment against Repak arising out of his actions as the Executive Director of the JRA. The six counts related to three underlying factual circumstances: Counts 1 and 2 pertained to Repak's receipt of Pittsburgh Steelers tickets from Kimball & Co.; Counts 3 and 4 dealt with the installation of a new roof on Repak's house by EADS; and Counts 5 and 6 related to the excavation services performed by L&M at Repak's son's gym. Counts 1, 3, and 5 charged Repak with violations of the Hobbs Act, 18 U.S.C. § 1951(a), for knowing obstruction, delay, or effect on commerce "by extortion" through the solicitation and receipt of goods and services, "which were not due him or his office, and to which he was not entitled, . . . in exchange for [his] official action and influence as the Executive Director of the [JRA] to facilitate the award of [JRA] contracting work." JA55, JA57, JA59. Counts 2, 4, and 6 charged Repak with violations of the federal program bribery statute, 18 U.S.C. § 666(a)(1)(B), alleging that he "did corruptly solicit, demand, accept, and agree to accept something of value, intending to be influenced and rewarded in connection with [JRA business]," specifically that Repak respectively "solicited and obtained" goods and services "in exchange for his official actions and influence as the Executive Director of the [JRA]." JA56, JA58, JA60.

8

Before trial, the District Court decided two motions in limine filed by the Government that were relevant to Repak's appeal. First, Repak challenged the admission of evidence of solicitations and items he received beyond those items charged in the indictment ("other-acts evidence"). The District Court allowed the Government to introduce the other-acts evidence, determining that the evidence was admissible to prove Repak's mental state for the charged offenses. *See United States v. Repak*, No. 3-14-cr-00001, 2015 WL 4108309, at *4–6 (W.D. Pa. July 7, 2015). Second, Repak challenged the admission of evidence of an affair he had with Walter under Rule 403 of the Federal Rules of Evidence. Following briefing on the issue, the District Court permitted admission of the affair evidence, concluding the affair was relevant to Repak's mental state and would further assist the jury in assessing Walter's credibility when she testified. *See* JA11–17.

At trial, the parties jointly proposed and, with limited exceptions not relevant here, agreed to jury instructions. The District Court later read those instructions to the jury. The instructions informed the jury of the elements of the two charged offenses—violations of the Hobbs Act and the federal program bribery statute. The elements of a Hobbs Act violation were defined as follows:

> First, that the defendant took from [the three JRA contractors] the property described in

9

Counts 1, 3, and 5. Second, that the defendant did so knowingly and willfully by extortion under color of official right. Third, that as a result of defendant's actions interstate commerce was obstructed, delayed, or affected.

JA656. The elements of federal program bribery were defined as:

First, that at the time alleged in the indictment defendant was an agent of the [JRA]. Second, that the [JRA] received federal benefits in excess of $10,000 in a one-year period. Third, that defendant solicited and accepted something of value from [the three JRA contractors]. Fourth, that defendant acted corruptly with the intent to be influenced or rewarded in connection with the business and transactions of the [JRA].

JA660–61. Repak's main defense to the charges at trial was that he lacked the requisite mental state in accepting any items to influence the awarding of JRA contracts.

The jury convicted Repak on Counts 3 through 6, the Hobbs Act and federal program bribery charges involving the roof on Repak's house and the excavating services for his son's gym. The District Court sentenced

10

Repak to 42 months of incarceration on each count of conviction, with the sentences to run concurrently. The District Court also ordered Repak to pay restitution to EADS in the amount of $3,500 and to L&M in the amount of $15,000. Repak timely appealed his judgment of conviction and sentence.[2]

## III

The District Court had jurisdiction over this matter pursuant to 18 U.S.C. § 3231 because this case involves an offense against the laws of the United States. We have jurisdiction over the appeal under 28 U.S.C. § 1291.

On appeal, Repak raises six arguments related to the District Court's evidentiary rulings, the jury instructions, the sufficiency of trial evidence, and the prosecutor's conduct during closing arguments. We conclude that none are meritorious.

## A

Repak's first contention is that, under Rule 404(b) of the Federal Rules of Evidence, the District Court improperly admitted evidence of his solicitations of items from JRA contractors beyond those charged in the

---

[2] While Repak's notice of appeal identifies his sentence as being appealed, he raises no argument related to the sentence independent of his challenges to the judgment of conviction.

11

indictment. We review the District Court's evidentiary ruling for abuse of discretion, *e.g. United States v. Friedman*, 658 F.3d 342, 352 (3d Cir. 2011) (citing *United States v. Starnes*, 583 F.3d 196, 213–14 (3d Cir. 2009)), but also "exercise plenary review . . . to the extent [the rulings] are based on a legal interpretation of the Federal Rules of Evidence," *Complaint of Consolidation Coal Co*., 123 F.3d 126, 131 (3d Cir. 1997).

Rule 404(b)(1) states: "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). While generally excluding evidence of an individual's "other acts" to show that individual's propensity to behave in a certain manner, Rule 404(b)(2) permits admission of other-acts evidence "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

"Rule 404(b) is a rule of general exclusion . . . ." *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014); *see also United States v. Brown*, 765 F.3d 278, 291 (3d Cir. 2014) ("Rule 404(b) is generally a rule of exclusion."). That is, "Rule 404(b) directs that evidence of prior bad acts be excluded—*unless* the proponent can demonstrate that the evidence is admissible for a non-propensity purpose." *Caldwell*, 760 F.3d at 276. We

12

clarified in *Caldwell* that this Court's past description of Rule 404(b) as "inclusionary," *see, e.g., United States v. Cruz*, 326 F.3d 392, 395 (3d Cir. 2003), referred to Rule 404(b)(2)'s language allowing other-acts evidence to be used for any purpose other than to show propensity, Fed. R. Evid. 404(b)(2). *See Caldwell*, 760 F.3d at 276. That is, our prior reference to Rule 404(b) as inclusionary "merely reiterate[d] the drafters' decision to not restrict the non-propensity uses of evidence." *Id.* We used that language because, prior to Rule 404(b), the corresponding common law rule for other-acts evidence limited the uses of such evidence. *See United States v. Green*, 617 F.3d 233, 244 (3d Cir. 2010). Rule 404(b) altered the common law rule with "inclusionary" language, allowing the proponent of other-acts evidence to identify any non-propensity purpose and no longer requiring the proponent "to pigeonhole his evidence into one of the established common-law exceptions, on pain of exclusion." *Id.* In sum, Rule 404(b) is a rule of exclusion, meaning that it excludes evidence unless the proponent can demonstrate its admissibility, but it is also "inclusive" in that it does not limit the non-propensity purposes for which evidence can be admitted.

Because Rule 404(b) is a rule of general exclusion, the party seeking to admit other-acts evidence has "the burden of demonstrating [the evidence's] applicability." *Caldwell*, 760 F.3d at 276. Admissibility under Rule 404(b) requires the satisfaction of four distinct steps: (1)

13

the other-acts evidence must be proffered for a non-propensity purpose; (2) that evidence must be relevant to the identified non-propensity purpose; (3) its probative value must not be substantially outweighed by its potential for causing unfair prejudice to the defendant; and (4) if requested, the other-acts evidence must be accompanied by a limiting instruction. *See Huddleston v. United States*, 485 U.S. 681, 691 (1988); *Caldwell*, 760 F.3d at 277–78.

The Government here sought to introduce evidence of Repak's "business relationships with vendors of the JRA, which specifically include[d] instances of other uncharged acts of solicitations by Mr. Repak to JRA vendors, including but not limited to" Kimball & Co., EADS, and L&M. JA123. Without further explanation, the Government contended in its motion in limine that Repak's "prior course of conduct and business dealings/relationship with the named entities, including previous solicitations, [was] extremely relevant and [would] go directly to prove" Repak's "knowledge" and "corrupt intent." JA125–26. The prosecution also argued that the uncharged acts of solicitation were admissible under Rule 404(b) as "background" evidence to "complete[] the story" and provide "context." JA127–29.

The District Court permitted introduction of the proffered evidence. In relevant part, the District Court reasoned:

14

[T]he Court finds that the Rule 404(b) evidence that the Government intends to introduce is admissible. . . . Defendant's business dealings with the various vendors, including other instances of solicitations that were not charged in the indictment in this case, are relevant to showing a necessary element of the crimes charged in this case. Specifically, these business dealings and other solicitations will be used by the Government to establish Defendant's knowledge as to the charges of extortion under color of official right and his willful intent as to the charges of solicitation by a bribe. Thus, the "other acts" evidence is being introduced for a proper evidentiary purpose and not as propensity evidence. . . . The Government intends to introduce other act evidence to develop examples of solicitations during the course of Defendant's business transactions with various entities, and for which Defendant acted with the requisite corrupt intent and knowledge. Likewise, the Government's evidence of other solicitations is relevant under Rule 401 to establish necessary elements of the crimes charged in this case. The Government has presented a sufficient chain of inferences connecting these other

15

acts to material facts in this case without implicating the evidentiary rules' prohibition of using propensity evidence. Furthermore, this evidence satisfies the balancing requirements of Rule 403. The other act evidence to be introduced by the Government is probative of facts in this case and that probative value is not substantially outweighed by any unfair prejudice. Finally, in accordance with the law on this issue, the Court will provide a limiting instruction as necessary.

JA25–27.

Repak challenges the sufficiency of the District Court's Rule 404(b) analysis, arguing that (1) the District Court failed to properly explain how the uncharged acts of solicitation relate to a non-propensity purpose and (2) the District Court erred by not properly scrutinizing the evidence's prejudicial effect vis-à-vis its probative value. We agree with Repak that the District Court's analysis was lacking but conclude that, under a proper Rule 404(b) analysis, the Government's other-acts evidence was admissible.

We proceed by critically analyzing each of the four steps in the methodological process for determining admissibility under Rule 404(b).

16

The Government and District Court satisfied step one of the applicable Rule 404(b) analysis, properly identifying a non-propensity purpose for introducing Repak's other past solicitations—knowledge and intent.[3] *See Brown*, 765 F.3d at 291; *Caldwell*, 760 F.3d at 276. The plain text of Rule 404(b) allows for the admission of other-acts evidence to show knowledge and intent as the Government proffered here. *See* Fed. R. Evid. 404(b) (noting that other-acts evidence may be admissible for proving "intent" and "knowledge"); *see also United States v. Vega*, 285 F.3d 256, 261 (3d Cir. 2002) ("Evidence of prior bad acts may be admitted for the purpose of demonstrating the defendant's knowledge in

---

[3] The District Court did not address the Government's suggestion that the other-acts evidence provides "background" for the case. We have held that the use of other-acts evidence as "background" can be permissible, *see, e.g.*, *Green*, 617 F.3d at 247, but have recently cautioned against overreliance on this purpose as a means for admitting other-acts evidence, *see United States v. Steiner*, 847 F.3d 103, No. 14-4628, 2017 WL 437657, at *4–6 (3d Cir. Feb. 1, 2017). Because the District Court did not rely on the use of other-acts evidence as "background" and the evidence here properly showed Repak's mental state, we need not address the propriety of the Government's proposed "background" use.

the later offense with which he is charged."). Repak put his mental state at issue in this case. His knowledge and intent are elements of the two charged offenses. *See* 18 U.S.C. § 1951(a); 18 U.S.C. § 666(a)(1)(B); *see also Evans v. United States*, 504 U.S. 255, 268 (1992) (concluding that, to show extortion under the Hobbs Act, the Government must prove that a defendant obtained a payment "knowing that the payment was made in return for official acts"). Repak contested those elements at trial, contending that he did not accept items from JRA contractors with the intention of influencing the awarding of JRA contracts. Use of the uncharged solicitations to show Repak's mental state was a proper non-propensity use of that evidence under Rule 404(b).

2

The Government and District Court, however, faltered at step two of the Rule 404(b) analysis. Both failed to explain how the Government's proffered evidence was relevant to Repak's mental state. *See Caldwell*, 760 F.3d at 276 (other-acts evidence must be "relevant to [a non-propensity] purpose"). Nonetheless, the admission of this evidence was proper because it was relevant to that non-propensity purpose.

To be relevant, proffered evidence must fit into "a chain of inferences—a chain that connects the evidence to a proper purpose, no link of which is a forbidden propensity inference." *United States v. Davis*, 726 F.3d

18

434, 442 (3d Cir. 2013). "[T]his chain [must] be articulated with careful precision because, even when a non-propensity purpose is 'at issue' in a case, the evidence offered may be completely irrelevant to that purpose, or relevant only in an impermissible way." *Caldwell*, 760 F.3d at 281.

We have recently reiterated the importance of concretely connecting the proffered evidence to a non-propensity purpose. In *United States v. Caldwell*, we rejected the use of prior gun possession convictions to show a defendant's knowledge that he actually possessed a gun. *Id.* at 283. Testimony at trial demonstrated that the defendant was seen carrying the gun, and yet the Government proceeded to introduce the defendant's prior gun possession convictions to show his actual possession of the charged gun. *Id.* at 279. "Because the Government proceeded solely on a theory of actual possession," we held that the defendant's "knowledge was not at issue in the case." *Id.* ("[A]bsent unusual circumstances (such as when a defendant claims he did not realize the object in his hand was a gun), the knowledge element in a felon-in-possession case will necessarily be satisfied if the jury finds the defendant physically possessed the firearm."). We reached that conclusion because we could observe "no articulation by the Government of a logical chain of inferences showing *how* [the defendant's] prior convictions [were] relevant to show [the non-propensity purpose of] knowledge." *Id.* at

19

281. Rather, the Government there simply relied on ipse dixit, stating the "baseline position" that the evidence of the defendant's prior gun convictions was "generally relevant" to show the defendant's knowledge that he possessed the gun related to the charged offense. *Id.* That baseline position told us "nothing about how the evidence" helped established the defendant's knowledge. *Id.* We further observed that the District Court in *Caldwell* "likewise failed to articulate how the disputed evidence tend[ed] to show that [the defendant] knowingly possessed the gun [related to the charged gun possession]." *Id.* In doing so, we "emphasize[d] that it is not enough to merely recite a Rule 404(b) purpose that is at issue; the Court must articulate how the evidence is probative of that purpose." *Id.* at 282. In summary, *Caldwell* makes clear that a logical chain of inferences must be articulated so that we are "assure[d] that the evidence is not susceptible to being used improperly by the jury." *Id.*

Similarly, in *United States v. Brown*, 765 F.3d 278 (3d Cir. 2014), we rebuffed the Government's efforts to introduce evidence of a defendant's previous use of straw purchasers to buy guns to show that the defendant had knowledge that he was in a car with a gun. *Id.* at 294. As in *Caldwell*, we began by noting the complete lack of an explanation by the Government for *how* its evidence was relevant to its proffered non-propensity purpose. *See id.* at 293 ("The Government has completely failed to

20

explain how the fact that [the defendant] used a straw man in 2005 to *purchase* firearms tends to prove that he knowingly *possessed* the gun under the driver's seat of the Impala six years later. These are two entirely distinct acts, and participation in one has no relationship to the other."). The Government's explanation was that the defendant's prior use of a straw purchaser made it "more likely that he used . . . a straw purchaser to obtain the gun" he was charged with possessing. *Id.* That, we noted, was "too great a leap in logic" and "indubitably forged" the Government's chain of inferences "with an impermissible propensity link." *Id.* Critically, the District Court there also failed to explain sufficiently its basis for admitting the evidence. The District Court stated simply that the Government could use the evidence "to show motive or knowledge *and that type of thing along those lines*." *Id.* at 294 (citations omitted). We instructed that the District Court "should not merely inquire of the prosecution what it wishes the evidence to prove" but rather put the Government to the task of explaining how the evidence "should work in the mind of a juror to establish the fact the government claims to be trying to prove." *Id.* (quotation marks and citations omitted).

The Government's proffer and District Court's explanation here fell short, failing to explain how evidence of uncharged solicitations would have a tendency to make Repak's knowledge and intent more

21

probable in the mind of a juror. The question is whether the evidence of other uncharged solicitations by Repak was relevant to show Repak's mental state as to the charged conduct—solicitation of the roof and excavation services. In its motion in limine, the Government merely stated, in cursory fashion, that Repak's "prior course of conduct and business dealings/relationship with the named entities, including previous solicitations, [was] extremely relevant and [would] go directly to prove" Repak's "knowledge" and "corrupt intent." JA125–26. As in *Caldwell* and *Brown*, the Government failed to articulate a chain of inferences supporting the admission of Repak's uncharged solicitations. Instead, the Government stated only that a logical chain connecting the evidence to a non-propensity purpose exists. That statement is not enough to demonstrate the admissibility of Rule 404(b) evidence. The District Court should have asked the Government to explain "how the proffered evidence should work in the mind of a juror to establish" Repak's knowledge and intent related to the roof and excavation services. *Caldwell*, 760 F.3d at 282 (quoting *United States v. Miller*, 673 F.3d 688, 699 (7th Cir. 2012)).

The District Court's analysis of the Rule 404(b) admission is also wanting. As quoted above, the District Court observed, "Defendant's business dealings with the various vendors, including other instances of solicitations that were not charged in the indictment in this case, are

22

relevant to showing a necessary element of the crimes charged in this case." JA26. It added that "[t]he Government ha[d] presented a sufficient chain of inferences connecting these other acts to material facts in this case." JA27. Like the Government's explanation, this analysis is inexact and fails to adequately link the other-acts evidence to a non-propensity purpose with "careful precision." *Caldwell*, 760 F.3d at 281; *see also Brown*, 765 F.3d at 294 ("When confronted with a proffer under Rule 404(b), a district court should not merely inquire of the prosecution what it wishes the evidence to prove."). In essence, this was the "mere recitation of the purposes in Rule 404(b)(2)" that we have previously deemed inadequate. *Caldwell*, 760 F.3d at 277.

Despite the inexact nature of the Government's proffer and the District Court's Rule 404(b) analysis, our review of the record leads us to conclude that the evidence of Repak's uncharged solicitations was properly admitted to prove Repak's mental state. Although we strongly prefer that the Government and District Court provide the chain of inferences supporting the admission of other-acts evidence (as this Court has repeatedly required), we are able to discern that the chain exists here. Repak repeatedly solicited and received items from JRA contractors at great cost to the contractors; the growing costs of these items to the JRA contractors tends to show that Repak knew that these items were not

23

unilateral token gifts; therefore, it is more likely that Repak knowingly and intentionally accepted the roof and excavating services with an understanding that those items were to influence the award of JRA contracts to those contractors.[4] This chain of inferences did not require the jury to make "too great a leap in logic." *Brown*, 765 F.3d at 293.

That chain of inferences is not unfamiliar. In *United States v. Console*, 13 F.3d 641 (3d Cir. 1993), we

---

[4] The uncharged solicitations may also have been used to explicate Repak's guilt by providing insight into the minds of the contractors Repak extorted: through Repak's repeated demands for items, the JRA contractors came to believe that they would lose JRA work if they failed to acquiesce in his demands. Testimony revealing the state of mind of an extortion victim is relevant in Hobbs Act cases. *See United States v. Stirone*, 311 F.2d 277, 280 (3d Cir. 1962) ("It is well settled that testimony showing the state of mind of the victim is permitted in Hobbs Act cases."); *see also United States v. Dozier*, 672 F.2d 531, 542 (5th Cir. 1982) ("[T]he victim's fearful state of mind is a crucial element in proving extortion." (quoting *United States v. Hyde*, 448 F.2d 815, 845 (5th Cir. 1971))); *United States v. Craig*, 573 F.2d 513, 520 (7th Cir. 1978) ("We believe that the state of mind testimony of the victims was admissible to show that the victims' consent was induced by defendant's office.").

24

upheld the admission of other-acts evidence against two lawyers who conspired with a doctor to submit fraudulent medical bills to insurances companies. *Id.* at 658–59. The other-acts evidence there showed that the lawyers also engaged in a similar scheme with doctors other than the doctor charged in the indictment. *Id.* We reasoned that the other-acts evidence "tended to support the finding that [the lawyers] knew [the] bills [related to the charged conduct] were fraudulent and that they intentionally submitted them to insurance companies as part of a broader plan to defraud insurance companies through fraudulent personal injury claims." *Id.* at 659. For that reason, we permitted admission of the evidence under Rule 404(b).

In a recent similar case, we concluded that Rule 404(b) allowed for the admission of evidence that a defendant—the Executive Director of the Legislature for the Virgin Islands—received a kickback bribe from a third party. *See United States v. Willis*, 844 F.3d 155, 169–70 (3d Cir. 2016). Much like the present case, the Government alleged that the defendant received money from contractors in exchange for the defendant's facilitating the award of certain renovation contracts to those same contractors. *Id.* at 158. The Government proffered other-acts evidence showing that, while he held a different government position, the defendant received money from an individual in exchange for lifting a lien on that individual's bank account. *Id.* at 169. The

25

individual was one of the contractors connected to the charged conduct. *Id.* The purpose for introducing that proffered evidence was "to demonstrate that [the defendant] was not mistaken about the nature of the transactions involved in the . . . renovation and fully intended to accept bribes and commit extortion." *Id.* at 169–70. We determined that a "strong nexus" existed between the past bribe the defendant received and the charged conduct. *Id.* More specifically, the earlier bribe demonstrated that the charged payments from contractors "were not loans, that they were not gifts, and that [the defendant] intended to accept cash in exchange for handing out more government contract work." *Id.*

Much like in *Willis*, the past solicitations here were closely related to the charged acts, and participation in one had a relationship to the other. *Cf. Brown*, 765 F.3d at 293. The Government's evidence of uncharged solicitations demonstrated Repak's course of conduct over a relatively circumscribed time period with the same actors involved in the charged conduct. That evidence thus tends to show that Repak "intended to accept [the roof and excavating services] in exchange for handing out more government contract work." *Willis*, 844 F.3d at 170. The other-acts evidence makes it more likely that Repak did not "unwittingly" solicit and receive the roof and excavation services without knowing or intending that the services were meant to influence him in his role as the JRA's Executive Director. *Vega*, 285 F.3d at 262

26

(permitting use of Rule 404(b) evidence related to prior conspiracy to show that the defendant "did not unwittingly participate" in the charged crime). Therefore, while the Government and District Court failed to adequately connect the other-acts evidence to a non-propensity purpose, a more fulsome examination demonstrates that the evidence was relevant to prove Repak's mental state.

3

The District Court's analysis also fell short at step three of the Rule 404(b) analysis. That third step requires that other-acts evidence must not give rise to a danger of unfair prejudice that substantially outweighs the probative value of the evidence under Rule 403 of the Federal Rules of Evidence. *See Brown*, 765 F.3d at 291. Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. Rule 403 "creates a presumption of admissibility." *United States v. Claxton*, 766 F.3d 280, 302 (3d Cir. 2014). "Evidence cannot be excluded under Rule 403 merely because its unfairly prejudicial effect is greater than its probative value. Rather, evidence can be kept out only if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value." *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002) (alteration in original) (quoting Fed. R. Evid. 403). Nevertheless, district courts must undertake some

27

analysis, i.e., provide "meaningful balancing," when applying Rule 403 to determine the admissibility of Rule 404(b) evidence. *Caldwell*, 760 F.3d at 283. "We will reverse where the Court's reasoning 'is not apparent from the record.'" *Id.* (quoting *United States v. Smith*, 725 F.3d 340, 348 (3d Cir. 2013)).

The balancing (or lack thereof) performed in *Caldwell* is instructive. In *Caldwell*, the District Court stated: "What I want to say is that not only are [the past convictions] admissible under 404(b), but because knowledge and intent are at issue here, they are more probative than prejudicial. I find that the probative value outweighs any prejudicial effect as well as to their admissibility." *Id.* at 284. That analysis, we concluded, offered "nothing more than a bare recitation of Rule 403." *Id.* The omission of any "meaningful evaluation" of the prejudicial effect of the Rule 404(b) evidence failed to ensure that the probative value of the evidence was not outweighed by the danger of unfair prejudice. *Id.*

The District Court's analysis here is strikingly similar to the recitation of Rule 403 we determined to be inadequate in *Caldwell*. The District Court stated simply that the other-acts evidence "satisfies the balancing requirements of Rule 403." JA27. In the following sentence, the District Court simply reiterated its conclusion: "The other act evidence to be introduced by the Government is probative of facts in this case and that

28

probative value is not substantially outweighed by any unfair prejudice." *Id.* Although the Government tendered its Rule 403 balancing when offering its evidence, the District Court needed to provide its own Rule 403 balancing before admitting the evidence. An evaluation under Rule 403 is not meaningful if it merely states a bare conclusion. More is required. As the District Court failed to offer its own reasoning, the District Court's balancing failed to provide "meaningful evaluation" of the Government's evidence of Repak's uncharged solicitations. *Caldwell*, 760 F.3d at 284.

That said, it is "apparent from the record" that the prejudicial effect of the Government's evidence does not substantially outweigh the probative value of that evidence. *Id.* The probative value of Repak's past solicitations was significant. *See Willis*, 844 F.3d at 170 (upholding the admission of a past bribe as evidence tended to show that a government official did not perceive the bribe to be a loan or a gift); *Vega*, 285 F.3d at 262 (permitting use of Rule 404(b) evidence because that evidence tended to show that the defendant "did not unwittingly participate" in the charged crime); *Console*, 13 F.3d at 659 (concluding that Rule 404(b) evidence was relevant to show defendants' knowledge and intent regarding the charged conduct). Moreover, Repak challenged the proof as to his knowledge and intent, making those elements of the charged offenses the centerpiece of the trial. *Cf. Caldwell*, 760 F.3d at 283

29

("[T]he probative value of prior act evidence is diminished where the defendant does not contest the fact for which supporting evidence has been offered."). Repak himself concedes that this evidence played a key role at trial and likely contributed to the Government's carrying its burden as to his mens rea. *See* Reply Br. 16 ("[A]t trial the Government repeatedly emphasized the 404(b) evidence . . . .").

That compelling probative value is not substantially outweighed by any prejudice arising from the admission of the uncharged solicitations. For one, as explained below, the District Court provided a limiting instruction, mitigating any concern that the jury would have used this evidence to draw a propensity inference. *See infra*. We have no reason to believe the jury did not follow the limiting instruction. *See United States v. Newby*, 11 F.3d 1143, 1147 (3d Cir. 1993) ("[W]e presume that the jury will follow a curative instruction unless there is an 'overwhelming probability' that the jury will be unable to follow it and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." (internal quotation marks and citations omitted) (quoting *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987))). Second, any prejudice here does not compare to the "heightened" prejudicial impact identified in *Caldwell*. 760 F.3d at 284. There, we observed the "heightened" prejudice caused by the introduction of other-acts evidence when that evidence was "admitted in

30

the form of a prior criminal conviction, especially a prior conviction for the same crime as that being tried." *Id.* In comparison, the Government here introduced other-acts evidence of Repak's *uncharged* conduct. Given that difference, the evidence of Repak's uncharged conduct was simply not of the same prejudicial ilk as the identical past convictions introduced in *Caldwell*.

The District Court's application of Rule 403 to the Government's other-acts evidence lacked the rigor this Court requires. Yet in our application of proper Rule 403 scrutiny, we conclude than any danger of unfair prejudice resulting from admission of Repak's uncharged solicitations fails to substantially outweigh the probative value of those solicitations.

31

Finally, the District Court dutifully performed the fourth step of the Rule 404(b) analysis, appropriately providing limiting instructions for the other-acts evidence as requested by Repak. As we have held, the District Court must provide the jury with a limiting instruction, if requested, "advis[ing] the jury that the evidence is admissible for a limited purpose and may not be considered in another manner." *Caldwell*, 760 F.3d at 277; *see also Brown*, 765 F.3d at 291. Here, the District Court provided two limiting instructions. During the trial, the District Court advised the jury that:

> [t]his evidence of other acts, in other words, acts that are not charged in the indictment, was admitted only for limited purposes. You may only consider this evidence for the purpose of deciding whether the defendant had the state of mind, knowledge, or intent necessary to commit the crimes charged in the indictment.

JA341–42. At the close of the evidence, the District Court instructed, "[The] evidence of other acts was admitted for limited purposes. You may consider this evidence only for the purpose of deciding whether the defendant had the knowledge or intent necessary to commit the crimes charged in the indictment." JA649–50. The District Court thus satisfied step four in

providing a limiting instruction on the jury's use of the Rule 404(b) evidence.

***

We agree with Repak that the Government and District Court failed to adequately explain the basis for admitting the other-acts evidence under Rule 404(b). Nevertheless, under a proper Rule 404(b) inquiry, the evidence of Repak's uncharged solicitations was admissible.

B

Repak contends that the admission of evidence regarding his affair with his assistant, Debbie Walter, was an error under Rule 403 of the Federal Rules of Evidence. This Court reviews the District Court's admission for abuse of discretion. *See United States v. Bailey*, 840 F.3d 99, 117 (3d Cir. 2016).

As noted above, Rule 403 states: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. We have observed:

> Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government

33

to sanitize its case, to deflate its witnesses'
testimony, or to tell its story in a monotone.

*Cross*, 308 F.3d at 325 (quoting *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998)). Thus, a district court need only keep out evidence "if its unfairly prejudicial effect 'substantially outweigh[s]' its probative value." *Id.* at 323.

In briefing before the District Court, Repak contended that his affair with Walter was "irrelevant to the charges in the Indictment or simply prejudicial." JA77. In response, the Government explained that the affair "put[] [Walter's] actions and testimony into context," "squarely addresse[d] facts at issue, *i.e.*, whether or not solicitations and receipt of items occurred as charged," and impacted Walter's credibility. JA152. The District Court ruled that, while prejudicial, evidence of the affair was also highly probative. JA15. According to the District Court, the affair was "relevant to the Government's burden of showing Defendant's mental state regarding the crimes charged." JA15. As an example, the District Court observed that "witnesses will testify that solicitations by Defendant were made to benefit Walter because she was his paramour," thus demonstrating a motive for certain solicitations. *Id.* It also accepted the Government's argument that the affair would assist the jury in assessing Walter's credibility. JA15–16.

34

Repak's argument on appeal is two-fold but straightforward. He contends that evidence of his affair was not relevant and that the prejudice created by its admission substantially outweighed whatever probative value that evidence has. Repak's arguments are ultimately unpersuasive. The District Court reasonably exercised its discretion to admit the affair evidence. *See United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665 (3d Cir. 2000) ("If judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978))).

The Government elicited testimony from multiple JRA contractors regarding requests for items coming directly from Walter. *See, e.g.,* JA327; JA374; JA384. Those contractors also testified that they would buy items for Walter at Repak's request. *See, e.g.*, JA327. One contractor affirmed that he had knowledge of the affair while the solicitations were occurring, and another knew that giving Walter items would make Repak happy. JA289–90; JA327. For her part, Walter admitted that she had a romantic relationship with Repak. JA406. She also testified that she would occasionally email Repak's requests for items to JRA contractors. JA408. She stated that she would make these requests because of "both" her business and personal relationship with Repak. JA409. Finally, Repak himself admitted to the affair. JA514–15.

35

Given this legal and factual background, the evidence of Repak's affair was relevant. *See* Fed. R. Evid. 401. For one, testimony of the affair tended to show that Repak possessed the requisite mens rea when obtaining items from the JRA contractors. More specifically, the evidence may have explained Repak's motivation in making certain requests. *See, e.g.*, JA409–10 (Walter testifying that she asked Repak to get tickets to a Tony Bennett performance). Evidence of the affair may also have shown that Repak knew the items were given to Walter to please him and thereby garner contracts for the JRA contractors. *See* JA327 (stating that items were provided for Walter because she "was Mr. Repak's assistant and with him constantly and was involved with all their projects the same"); *cf. United States v. Scarfo*, 850 F.2d 1015, 1020 (3d Cir. 1988) (permitting admission of evidence "describing [witnesses'] relationship to the defendants . . . to illustrate the witnesses' role in the [criminal acts]"). Second, the affair evidence assisted the jury in assessing Walter's credibility. Her credibility was at issue when it came to her testimony about the requests she made for Repak, Repak's views about the gratuities policy enacted by the JRA, and the reasons she was willing to help Repak make those requests. As we have unequivocally held, "evidence concerning a witness's credibility is always relevant, because credibility is always at issue." *Green*, 617 F.3d at 251. The affair evidence was unquestionably relevant.

36

While relevant, the affair evidence likely caused some prejudice to Repak. The record, however, fails to demonstrate that that prejudice was unfair or that it substantially outweighed the evidence's probative value. The affair evidence was hardly a main feature of the trial.[5] The testimony outlined above constitutes the entirety of the testimony regarding the affair. In short, trial testimony regarding the affair was not belabored; it simply advised the jury of the personal relationship between Repak and Walter for the permissible purposes mentioned above.

Thus, given the probative value of the affair evidence and the limited nature of its prejudicial effect, the District Court did not abuse its discretion in admitting that evidence. *See United States v. Lee*, 612 F.3d 170, 190 (3d Cir. 2010) (observing that district courts are owed "substantial deference . . . in weighing evidence under Rule 403").

## C

Repak next challenges the sufficiency of the trial evidence underlying his convictions. "We exercise

---

[5] Repak argues that comments about his affair made by the Government attorney during closing arguments also prejudiced him. That argument is better framed as a claim of prosecutorial misconduct, and we address it below in that context.

37

plenary review over a district court's grant or denial of a motion for judgment of acquittal based on the sufficiency of the evidence, applying the same standard as the district court." *Starnes*, 583 F.3d at 206. "In reviewing a jury verdict for sufficiency of the evidence . . . [,] we must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt." *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008) (internal quotation marks and citations omitted) (quoting *United States v. Lore*, 430 F.3d 190, 204 (3d Cir. 2005)). This standard is "highly deferential." *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc). We "must be ever vigilant . . . not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting [our] judgment for that of the jury." *Id.* (alteration in original) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)).

1

Repak makes two arguments against his convictions on Counts 3 and 5, charging violations of the Hobbs Act, 18 U.S.C. § 1951. First, Repak contends that there is no evidence he received the roof and excavation services for his agreement to influence official acts. Second, Repak maintains that the award of JRA contracts is not an "official act" under § 1951 as interpreted by the

38

Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). We conclude that the trial evidence was sufficient to permit a rational trier of fact to find Repak guilty of both counts beyond a reasonable doubt.

i

Repak's contention that there is no evidence of an "agreement" to influence official JRA actions is wrong on the law and contrary to the record. When proving a violation of § 1951, the Government does "not have to show the defendant[] had an express agreement." *United States v. Bradley*, 173 F.3d 225, 231 (3d Cir. 1999). "[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." *Evans*, 504 U.S. at 268. Put differently, "it is sufficient if the public official understands that he is expected, as a result of the payment, to exercise particular kinds of influence or to do certain things connected with his office as specific opportunities arise." *Bradley*, 173 F.3d at 231 (quoting jury instructions). The instructions the District Court provided to the jury here mirrored the language from that case law:

> The government is not required to prove an explicit promise to perform the official acts in return for the payment. Passive acceptance of a benefit by a public official is a sufficient basis for this type of extortion if

39

the official knows that he is being offered payment in exchange for his ability to do official acts.

JA657–58.    Therefore, Repak's contention that the Government failed to demonstrate an "agreement" is unpersuasive.

While the Government need not show an agreement, it does need to demonstrate Repak's acceptance of the roof and excavating services knowing that they were given in exchange for his influencing the award of JRA contracts.    Rarely will the sort of knowledge the Government charged Repak with be reflected in a written agreement, nor does the Government need to produce such a document. *See Bradley*, 173 F.3d at 231.  Rather, the Government need only rely on circumstantial evidence. *Id.* at 232.  The Government did so here.

At trial, JRA contractors testified to the "unspoken understanding" between themselves and Repak.  JA333. Explaining why EADS provided Repak with free services, EADS employee Stephen Sewalk testified: "[I]f we didn't [follow Repak's instructions], I felt that we would lose work." JA284.  That view was based on more than intuition.  Repak would tell Sewalk, "'Hey, I'm reviewing some invoice here of yours,' which [was] usually followed up with some type of request." *Id.*; *see also* JA289 (recalling that Repak would threaten that he

40

would find "someone else" who would be willing to fulfill his demands); JA301 ("Mr. Repak provided a lot of, I said innuendos, subtle things throughout conversations. And then it would always be followed in a short period of time by either an instruction or request. . . . [W]ith him[,] [instructions and requests] were the same thing."). L&M employee Rick McNulty similarly explained that providing free services and items to Repak was simply "part of doing business with the [JRA] and Mr. Repak." JA311. He reached this conclusion following messages from Repak telling McNulty that Repak "need[ed]" certain items from L&M and follow-up calls from Repak to McNulty asking why items had not yet been provided. JA311, JA317. Putting a finer point on his testimony, McNulty stated that he knew that if he didn't provide those services, "it would be a problem from a work aspect." JA312.

As the old adage goes, "actions often speak louder than words." Here, the actions of the JRA contractors spoke volumes about their understanding with Repak. EADS provided Repak with a new roof, bearing $3,000 to $4,000 in costs. JA287–88; JA315–16. After receiving the new roof, Repak told Sewalk to bury EADS expenses in an invoice to the JRA. JA299–300. Sewalk testified that he knew his company would not get more work from the JRA if it required Repak to pay for his roof. JA289. Similarly, L&M provided Repak with excavating services for his son's gym, at a cost of

41

$17,500 to L&M. JA325–26. Echoing Sewalk's testimony, McNulty stated that when he asked Repak who he should invoice for the excavating services, Repak told him to "just bury it in invoices" to the JRA. JA326. This evidence was more than sufficient to show that Repak obtained the roof and excavating services, "knowing that the payment was made in return for official acts." *Evans*, 504 U.S. at 268.

Viewing that evidence in the light most favorable to the Government, a rational jury could have convicted Repak of the Hobbs Act charges. *See Bradley*, 173 F.3d at 231 (observing that "knowing winks and nods" demonstrating a mutual understanding with a public official was sufficient for conviction under § 1951 (quoting *Evans*, 504 U.S. at 274 (Kennedy, J., concurring in part and concurring in the judgment))).

ii

Repak's second contention regarding Counts 3 and 5, relying on *McDonnell v. United States*, is equally unpersuasive.

In *McDonnell*, the Supreme Court vacated convictions under § 1951 because jury instructions in that case improperly defined "official act." 136 S. Ct. at 2373. Pursuant to § 1951, a criminal offense occurs when an individual "obstructs, delays, or affects commerce . . . by extortion," with extortion defined as

42

"the obtaining of property of another, with his consent, . . . under color of official right." 18 U.S.C. § 1951(a), (b). The parties in *McDonnell* agreed that "extortion under color of official right" under § 1951 included the element of obtaining property knowing the property "was given in return for official action." 136 S. Ct. at 2365. The parties further agreed that "official action" should be given the same meaning those words have in the federal bribery statute, 18 U.S.C. § 201(a)(3). *Id.*

Section 201(a)(3) of the federal bribery statute defines an "official act" as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." 18 U.S.C. § 201(a)(3). The Supreme Court held that proving an "official act" requires a two-part showing. *McDonnell*, 136 S. Ct. at 2368.

"First, the Government must identify a 'question, matter, cause, suit, proceeding or controversy' that 'may at any time be pending' or 'may by law be brought' before a public official." *Id.* (quoting 18 U.S.C. § 201(a)(3)). The Supreme Court made two key clarifications as to this required showing. First, the Court defined a "question" or "matter" as "similar in nature to a cause, suit, proceeding, or controversy." *Id.* at 2369. The Court further clarified that the "question" or "matter" must "involve a formal exercise of

43

governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *Id.* at 2372. Second, the Court observed that the "question" or "matter" must also be "something specific and focused that is 'pending' or 'may by law be brought.'" *Id.* It described a "question" or "matter" that is "pending" as "something that is relatively circumscribed—the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369.

The second part of the showing to prove an "official act" requires the Government to "demonstrate that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so." *Id.* at 2368. Providing some contour to that requirement, the Court observed that "if a public official uses his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official, that too can qualify as a decision or action." *Id.* at 2370. By way of example, the Court noted that "a decision or action to initiate a research study" would sufficiently constitute a decision or action "on" a question or matter. *Id.*; *cf. United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 407 (1999) (observing that the hosting of a championship sports team by the President of the United States would not constitute an "official act").

44

As in *McDonnell*, the parties here agreed to instructions, read to the jury, which defined "extortion under color of official right" to mean "that a public official induced, obtained, accepted, or agreed to accept a payment to which he or she was not entitled, knowing that the payment was made in return for taking, withholding, or influencing *official acts*." JA657 (emphasis added). The instructions also required that the official acts be "pending before a government agency." JA658. The parties do not dispute that the definition of "official acts" comes from § 201(a)(3) of the federal bribery statute.

Repak insists that the trial evidence of his facilitating the award of JRA contracts failed to demonstrate an "official act," as defined in *McDonnell*, because that evidence did not demonstrate (1) a "question" or "matter" akin to "a lawsuit before a court, a determination before an agency, or a hearing before a committee" and (2) "something specific and focused that is 'pending' or 'may by law be brought' before a public official." 136 S. Ct. at 2368, 2372.

Repak's first *McDonnell* argument is off the mark. The awarding of a JRA contract is not only akin to an agency determination—it *is* an agency determination. The Supreme Court in *McDonnell* concluded that a "Revitalization Commission's" allocation of grant money was not only a sufficiently "focused and concrete" matter but also "involve[d] a formal exercise of governmental

45

power that is similar in nature to a lawsuit, administrative determination, or hearing." *Id.* at 2370. As in *McDonnell*, a decision by the JRA—a governmental agency—to award money to contractors as part of its public mission to develop Johnstown's infrastructure is undoubtedly the "formal exercise of governmental power." *Id.* at 2372. It is, plainly, an agency determination.

Repak's second *McDonnell* argument, that the award of JRA contracts is not a "specific and focused [question or matter] that is 'pending,'" is likewise unpersuasive. *Id.* In *McDonnell*, the Government argued that the focus of an event hosted by the defendant was "economic development" and that "economic development" was sufficiently narrow under § 201(a)(3). *Id.* 2368–69. The Supreme Court in *McDonnell*, however, concluded that "economic development" is not specific and focused. *Id.* at 2374. In doing so, the Court reasoned that "economic development is not naturally described as a matter 'pending' . . . any more than 'justice' is pending or may be brought by law before a judge, or 'national security' is pending or may be brought by law before an officer of the Armed Forces." *Id.* at 2369. It noted, though, that a "Revitalization Commission's" decision to allocate grant money would be a "focused and concrete" matter. *Id.* at 2370.

In the language of *McDonnell*, the award of JRA contracts is "specific and focused." It is a concrete

46

determination made by the JRA's Board of Directors and "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369. It is "something within the specific duties of an official's position—the function conferred by the authority of his office." *Id.* The JRA and its Board of Directors were undisputedly tasked with the responsibility of awarding contracts. The JRA received federal funds and, among other obligations, was "responsible to distribute those funds, . . . to provide for the engineering, [and] procurement of construction" related to redevelopment projects. JA491. As part of that process, and in his capacity as JRA Executive Director, Repak made recommendations to the JRA Board of Directors as to which contractors should be used on specific projects. JA507. The assigning of contractors to JRA projects can thus "naturally [be] described" as a matter "pending" before the JRA, unlike the nebulous issue of "economic development" in *McDonnell*. 136 S. Ct. at 2369.

Implicit in both of Repak's arguments under *McDonnell* is the suggestion that the facilitation of the award of those contracts is not a decision or action "on" a question or matter. The Supreme Court held in *McDonnell* that an action "on" a question or matter includes a public official's use of his position "to exert pressure on another official or provide advice, knowing or intending [that] such advice . . . form the basis for an

47

'official act.'" *Id.* at 2371. As demonstrated by the record here, Repak had the power to, and indeed did, make recommendations to the JRA as to the contractors it hired for projects. JA507. The evidence was sufficient for the jury to conclude that he accepted the roof and excavating services knowing that he was to use his power, i.e., the ability to provide advice, to influence the JRA's awarding of contracts.

Therefore, the facilitation of the award of JRA contracts is an "official act" as defined by *McDonnell*. Evidence of Repak's receipt of items knowing he was to facilitate the award of those contracts provided a sufficient basis for a rational trier of fact to convict him of the Hobbs Act charges under Counts 3 and 5.

2

As to Counts 4 and 6 related to 18 U.S.C. § 666, Repak argues that the trial evidence insufficiently demonstrated that he possessed the "corrupt" intent to be influenced by the roof and excavating services he received. Again, Repak is incorrect. A rational trier of fact could find the requisite intent beyond a reasonable doubt.

As outlined above, the JRA contractors testified to an unspoken but certain understanding between themselves and Repak under which they would provide Repak with items of value (usually items he specifically

48

requested) and Repak would influence the award of JRA contracts. The statements attributed to Repak at trial repeatedly suggested as much, and his continued receipt of items from those contractors further demonstrated that he intended for such items—the costs for which he instructed be buried in JRA invoices—to influence the award of JRA contracts to those contractors. In sum, when viewed in the light most favorable to the Government, the record demonstrates more than enough evidence for a rational trier of fact to conclude, beyond a reasonable doubt, that Repak possessed the requisite intent to convict him on the § 666 charges. *Cf. United States v. Andrews*, 681 F.3d 509, 529–30 (3d Cir. 2012) (concluding that the trial evidence sufficiently demonstrated the defendant's intent to have a public official influence government action under § 666).

D

Repak also argues that the District Court provided the jury with erroneous instructions. More precisely, he contends that the instructions related to the Hobbs Act (Counts 3 and 5) and the federal program bribery statute (Counts 4 and 6) failed to properly advise the jury of the elements of the offenses charged. The parties agree that plain error review applies. *See United States v. Zehrbach*, 47 F.3d 1252, 1260 & n.6 (3d Cir. 1995) ("Where a party has not made a clear, specific objection to the charge that he alleges is erroneous at trial, he waives the issue on appeal 'unless the error was so

49

fundamental and highly prejudicial as to constitute plain error.'" (quoting *Bennis v. Gable*, 823 F.2d 723, 727 (3d Cir. 1987))). "[B]efore an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.'" *Johnson v. United States*, 520 U.S. 461, 466–67 (1997) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). "[A]n error affects substantial rights when 'it affected the outcome of the [lower] court proceedings.'" *Gov't of the V.I. v. Mills*, 821 F.3d 448, 456 (3d Cir. 2016) (second alteration in original) (quoting *United States v. Marcus*, 560 U.S. 258, 262 (2010)). "It is a rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." *United States v. DiSalvo*, 34 F.3d 1204, 1215 (3d Cir. 1994) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)).

Although Repak fails to state the underlying legal basis for his jury instruction challenge, we have held:

> Due process requires that the Government prove every element of the charged offense beyond a reasonable doubt. Accordingly, jury instructions that relieve the Government of this burden violate a defendant's due process rights. *Carella v. California*, 491 U.S. 263, 265 (1989). The inquiry is whether the court's instruction constituted a mandatory presumption by "directly

50

> foreclos[ing] independent jury consideration of whether the facts proved established certain elements of the offense with which [the defendant] was charged." *Id.* at 266.

*United States v. Korey*, 472 F.3d 89, 93 (3d Cir. 2007) (citation omitted). In making this inquiry, the "[j]ury instructions must be read as a whole." *United States v. Flores*, 454 F.3d 149, 157 (3d Cir. 2006) (quoting *EEOC v. Del. Dep't of Health & Soc. Servs.*, 865 F.2d 1408, 1418 (3d Cir. 1989)). Jury instructions satisfy due process if "the charge as a whole fairly and adequately submits the issues in the case to the jury." *United States v. Thayer*, 201 F.3d 214, 221 (3d Cir. 1999) (quoting *Zehrbach*, 47 F.3d at 1264).

1

Repak first challenges the instructions associated with Counts 3 and 5, which charged violations of 18 U.S.C. § 1951. In relevant part, the jury instructions read:

> Count 3 of the indictment charges that . . . Repak[] did knowingly obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in [18 U.S.C. § 1951]. That is, [Repak], while executive director of the [JRA] engaged in a

51

course of conduct whereby [he] solicited and obtained from [EADS], with [EADS'] consent, a new roof on the personal residence of [Repak], . . . which was not due to him or his office and to which he was not entitled, in exchange for [his] official action and influence as the executive director of the [JRA], to facilitate the award of [JRA] contracting work to [EADS], all under color of official right and all in violation of [18 U.S.C. § 1951].

. . .

Count 5 of the indictment charges that . . . Repak did knowingly obstruct, delay, and affect commerce and the movement of articles and commodities in commerce by extortion, as those terms are defined in [18 U.S.C. § 1951]. That is, [Repak], while executive director of the [JRA] engaged in a course of conduct whereby [he] solicited and obtained from [L&M], with [L&M's] consent, building demolition and grading services at Evolution Gym, . . . which was not due to him or his office and to which he was not entitled, in exchange for [his] official action and influence as the executive director of the [JRA], to facilitate the award of [JRA] contracting work to [L&M], all

under color of official right and all in violation of [18 U.S.C. § 1951].

JA652–55.  The instructions then state that an element of § 1951 is that the defendant did "knowingly and willfully by extortion under color of official right" obtain property from the JRA contractors.  JA656.  The instructions go on to define "extortion under color of official right," defining the phrase to mean "that a public official induced, obtained, accepted, or agreed to accept a payment to which he or she was not entitled, knowing that the payment was made in return for taking, withholding, or influencing official acts."  JA657.

Repak advances two arguments regarding those instructions.  First, he contends that the jury instructions allowed the jury to convict him for any "official acts," without limiting the focus to only his facilitation of the award of JRA contracts.  Second, he argues that even if the indictment did not broaden the allowable "official acts" of which he could be convicted, the District Court failed to inform the jury that it must determine whether the facilitation of the award of JRA contracts is an official act.  Neither argument carries the day.

As to Repak's first argument, he fails to identify any other "official act" on which he could have been convicted, and, in doing so, fails to explain how he could have been convicted of "official acts" other than his facilitation of the award of JRA contracts.  And review of

53

the record reveals no other "official act" evidence presented by the Government. Indeed, the Government's only theory at trial was that Repak accepted the roof and excavating services knowing that he was expected to facilitate the award of JRA contracts to EADS and L&M.

Repak's second challenge to the § 1951 instructions fares no better. The District Court's instructions charged the jury with how it might find that Repak committed "extortion under color of official right" and defined that extortion to include the "influencing [of] official acts." JA657. The instructions go even further by identifying the "official act" as "facilitat[ing] the award of [JRA] contracting work." JA652–55. Thus, contrary to Repak's contention, the instructions were sufficient in requiring the jury to determine whether the facilitation of the award of JRA contracts constituted an "official act."

Reading the jury instructions as a whole, we believe those instructions "fairly and adequately submit[ed]" to the jury the issue of whether facilitating the award of JRA contracts constituted an "official act." *Thayer*, 201 F.3d at 221.

2

With regard to Counts 4 and 6, which charged violations of 18 U.S.C. § 666, Repak again argues that the jury instructions broadened the conduct that he could

be convicted of, beyond just the facilitation of the award of JRA contracts. He specifically takes issue with the following language from the instructions: "The fourth element the government must prove beyond a reasonable doubt is that [Repak] accepted or agreed to accept, or solicited something of value corruptly, and with the intent to be influenced or rewarded in connection with *some* business or transaction of the [JRA]." JA662 (emphasis added). According to Repak, that instruction permitted the jury to convict him of influencing any JRA "business or transaction," not merely the award of JRA contracts.

Reading those instructions as a whole, we conclude that the instructions did not violate Repak's due process rights. In summarizing the charges against Repak, the District Court stated:

> Count 4 of the indictment charges that . . . [Repak] did corruptly solicit, demand, accept, and agree to accept something of value, intending to be influenced and rewarded in connection with the business transaction and series of transactions of the [JRA] . . . . That is, [Repak] solicited and obtained a new roof on his personal residence in exchange for his official actions and influence as the executive director of the [JRA], to facilitate the award of contracting work to [EADS].

55

. . .

> Count 6 of the indictment charges that . . . [Repak] did corruptly solicit, demand, accept, and agree to accept something of value, intending to be influenced and rewarded in connection with the business transaction and series of transactions of the [JRA] . . . . That is, [Repak] solicited and obtained building demolition and grading services at [his son's gym] in exchange for his official actions and influence as the executive director of the [JRA], to facilitate the award of contracting work to [L&M].

JA653–56. Those instructions thus specifically identify the "business or transaction" the Government charged Repak with influencing: "the award of [JRA] contracting work." *Id.* Moreover, as with the charges under § 1951, Repak fails to identify any other JRA "business or transactions" in the trial evidence that could have supported a conviction. Again, the Government's only theory at trial was that Repak received a roof and excavating services from EADS and L&M, respectively, to facilitate the grant of JRA contracts. The instructions related to § 666, therefore, "as a whole fairly and adequately submit[ed] the issues in the case to the jury." *Thayer*, 201 F.3d at 221 (quoting *Zehrbach*, 47 F.3d at 1264).

56

E

Repak also asserts that reversal is called for because the indictment charging him was constructively amended. "We exercise plenary review in determining whether there was a constructive amendment of the indictment," but, "inasmuch as [Repak] did not raise the constructive amendment . . . in the district court we . . . consider [the issue] on a plain error basis." *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006).

In *United States v. Daraio*, we described the circumstances under which constructive amendment of an indictment occurs:

> An indictment is constructively amended when, in the absence of a formal amendment, the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged.

*Id.* at 259–60. "The key inquiry is whether the defendant was convicted of the same conduct for which he was indicted." *Id.* at 260 (quoting *United States v. Robles-Vertiz*, 155 F.3d 725, 729 (5th Cir. 1998)). "If a defendant is convicted of the same offense that was

charged in the indictment, there is no constructive amendment." *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010).

Repackaging his earlier challenge to his jury instructions, Repak contends that his indictment was constructively amended such that he could have been convicted for facilitating any "official act" under the Hobbs Act, Counts 3 and 5, and influencing any JRA "business or transaction" under the federal program bribery statute, Counts 4 and 6. Once again, Repak is wrong. The jury convicted him for the same conduct for which he was indicted.

In *Daraio*, we held that no constructive amendment of the indictment had occurred where the district court provided the jury with thorough instructions that tracked the language in the indictment. 445 F.3d at 261. The indictment in *Daraio* charged the defendant with a specific act of tax evasion, but the Government also introduced evidence of prior tax non-compliance. *Id.* at 260. We nevertheless concluded that "the district court's instructions ensured that the jury would convict [the defendant], if at all, for a crime based on conduct charged in the indictment." *Id.* We based our decision on the "basic tenet of our jurisprudence that a jury is presumed to have followed the instructions the court gave it." *Id.* (quoting *United States v. Givan*, 320 F.3d 452, 462 (3d Cir. 2003)). We also highlighted the district court's limiting instructions, which instructed the jury

58

that those other actions of tax non-compliance were not charged in the indictment and could not be the basis for a conviction. *Id.* at 261. For those reasons, we concluded: "[T]he district court obviated the possibility of the indictment being constructively amended by issuing accurate and thorough jury instructions precluding the jury from convicting [the defendant] for any conduct other than that which the indictment charged." *Id.*

Like in *Daraio*, Repak was convicted of the same conduct for which he was charged. First, as with his challenge to the jury instructions, Repak points to no other "official act" or "transaction" for which he could have been convicted. Second, as part of its jury charge, the District Court read each count in the indictment, which—as we noted above—identified the specific "official act" or "transaction" related to each count, i.e., the facilitation of "the award of [JRA] contracting work." JA651–56. Third, the District Court also instructed the jury multiple times that it was not to consider evidence of Repak's uncharged solicitations for any reason other than to prove his mental state *as to the crimes charged*. We presume, as we must, that the jury followed the District Court's instructions. *Daraio*, 445 F.3d at 260. We therefore conclude that the District Court "thoroughly and accurately instructed the jury on the basic elements of [Repak's charged offenses] and focused the jury's attention on the conduct that the indictment charged." *Id.* at 260–61. No constructive amendment of the indictment

59

occurred.

F

Finally, Repak raises a due process claim based on alleged prosecutorial misconduct during closing arguments.  Because Repak did not preserve this claim through objections at trial, we review for plain error.  *See Mills*, 821 F.3d at 456.

The Fifth Amendment's Due Process Clause provides defendants with a right to a fair trial, which includes protection from prosecutorial misconduct.  *See id.*  "When confronted with a claim that a prosecutor's remarks violated this right, we first determine whether those remarks constituted misconduct."  *Id.*  "If so, we proceed to determine whether that misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process . . . .'"  *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "Not all prosecutorial misconduct violates this right."  *United States v. Liburd*, 607 F.3d 339, 344 (3d Cir. 2010).  Rather, we examine "the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant."  *Lee*, 612 F.3d at 194 (quoting *Moore v. Morton*, 255 F.3d 95, 107 (3d Cir. 2001)).  "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements

or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *Id.* (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)); *see also Greer v. Miller*, 483 U.S. 756, 765 (1987) ("To constitute a due process violation, the prosecutorial misconduct must be of sufficient significance to result in the denial of the defendant's right to a fair trial." (internal quotations omitted)).

Repak complains that four statements made by the Government attorney in her closing argument constituted prosecutorial misconduct producing an unfair trial. We are not persuaded that any reversible error occurred.

1

Repak first points to statements regarding his affair with Walter. The Government attorney argued, "Not only did Mr. Repak have Ms. Walter as his mistress, but he also dictated e-mails to her where in those e-mails he instructed what he wanted." JA603. The prosecutor also stated:

> Speaking about how the rules don't matter—
> and by no means, am I or this Court the
> morality police, but it goes to show that the
> lines are blurred easily and rules are not
> followed easily with Mr. Repak. He
> engaged in an extramarital affair with his

61

assistant for years. His explanation was well, yes, it happened, but it was on and off.

So I guess we can assume from that, I'm faithful to my wife. I'm not faithful to my wife. I'm faithful to my wife. I'm not faithful to my wife. Yet another example of the blurring of what is permissible, even in his personal life that you heard about.

JA 609. This line of argument was inappropriate, irrelevant to any issue at trial, and unnecessarily prejudicial. No reasonable person could have heard these words and not have considered them a direct reference to Repak's marital infidelity. As such, the prosecutor's suggestion was that Repak was dishonest.

Nonetheless, we do not believe that these comments so tainted the trial as to violate Repak's Fifth Amendment rights. The District Court instructed the jury that the "statements and arguments of the lawyers for the parties" were not evidence the jury could consider. JA638; *see also United States v. Berrios*, 676 F.3d 118, 136 (3d Cir. 2012) ("These instructions were likewise an adequate response to the possibility that the improper commentary would lead the jury astray in its deliberations."). We again presume the jury followed the instructions they were given. *See Daraio*, 445 F.3d at 260. Also, on rebuttal, the Government attorney retreated from her previous statements and instead

62

refocused the jury on the affair's relevance in explaining both why Repak may have been asking for certain items and why Walter may have been involved in making solicitations. JA629–30. Finally, as we observed regarding Repak's challenge to the sufficiency of the evidence, "the jury was presented with ample evidence on which it could convict" Repak of the charged offenses. *Berrios*, 676 F.3d at 136. Considering the entire record, and taking into account the context in which the comments regarding Repak's affair were made, the prosecutor's improper remarks do not rise to the level of misconduct affecting the outcome of the trial.

2

Repak next states that the Government attorney referred during her closing to facts not in evidence. The Government planned to introduce testimony from one of Repak's employees, Debbie Kerr, regarding her involvement with Repak's solicitations. JA241–42. One witness testified that Kerr had been the JRA's secretary but was unavailable to testify because of a sudden hospitalization. JA431–32, JA447–48. Repak testified that Kerr "would initiate the calls to . . . vendors," making requests for food items such as lunch trays. JA507–08. During closing arguments, the Government attorney remarked:

> You will recall [Repak] testified and said, Kerr, the receptionist over at the JRA, would

63

call up and get contractors to deliver food trays. Kerr was going to be a government witness, who unfortunately, as a result of a sensitive medical issue . . . couldn't testify. And Mr. Repak comes in here and tells you that Kerr would call and solicit things from contractors to have food brought over to the JRA.

JA609–10.

Repak's argument that this statement constituted prosecutorial misconduct is baseless. Both the fact that Kerr would have been a government witness if not for her medical issue and Repak's testimony regarding her actions were already a part of the record. JA447–48; JA507–08. Responding to Repak's testimony, the prosecutor at most contextualized the fact that Repak had attempted to shift the responsibility for certain solicitations to someone who did not testify. *See Fahy v. Horn*, 516 F.3d 169, 204 (3d Cir. 2008) (a prosecutor may attack a defendant's credibility by "point[ing] out the inconsistencies" in his testimony). That was fair comment, simply noting the self-serving nature of the defendant's testimony. It did not come close to prosecutorial misconduct. *See Berger v. United States*, 295 U.S. 78, 88 (1935) (noting that a prosecutor "may prosecute with earnestness and vigor-indeed, he should do so").

64

Repak argues that the Government attorney improperly expressed her personal opinion regarding his guilt. The expression of a prosecutor's personal opinion about the guilt of a defendant creates a risk that the jury will "trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19 (1985). In relevant part, the prosecutor stated: "We clearly, without a doubt, met what we need[ed] to prove beyond a reasonable doubt to you." JA629. Repak's argument about this comment is unavailing.

As an initial matter, the attorney's statement cannot be fairly characterized as a "personal" opinion. The attorney simply stated, using the first person plural, that the Government considered its burden of proof to have been met. *See United States v. Sherrill*, 388 F.3d 535, 538 (6th Cir. 2004) (holding that the statement, "that man is guilty," was not improper because phrase was prefaced by "the government submits to you" (internal quotation marks omitted)); *see also United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991) ("The prosecutor is entitled to considerable latitude in summation to argue the evidence and any reasonable inferences that can be drawn from that evidence."); *cf. United States v. Andujar-Basco*, 488 F.3d 549, 560–61 (1st Cir. 2007) (observing that prosecutor's statement that "I have proven [the defendant's guilt], absolutely,"

was improper but did not necessitate a new trial). Moreover, focusing on the statement in context, we conclude that the prosecutor was responding to defense counsel's argument that the Government had failed to show certain elements of the charged offenses. *See* JA628–29. The prosecutor merely replied that the Government had put forth evidence to satisfy those elements. JA629. Thus, at best, "[t]he statement was merely an alternative—albeit less than desirable—form of arguing to the jury that the evidence adduced [as to those elements] proved [Repak's] guilt beyond a reasonable doubt." *United States v. Pupo*, 841 F.2d 1235, 1240 (4th Cir. 1988) (en banc); *see also United States v. Fischbach & Moore, Inc.*, 750 F.2d 1183, 1194 (3d Cir. 1984) ("By tying his remarks to evidence on the record, the prosecutor's remarks were not prejudicial." (citation omitted)). The Government attorney's statement was not an impermissible personal expression of Repak's guilt.

4

Finally, Repak takes issue with the following statement by the Government attorney:

> In closing the defense talked about, Well, thank you. Look what has happened to Johnstown, because now with Mr. Repak not here anymore, . . . Johnstown is now just going to go away.

66

Well remember, three things even had to be put in place before he even left [the JRA] because of the [way] he was carrying on business. . . . I ask you to convict him on this, and that is the best thank you that Johnstown can receive.

JA632. Repak contends the Government attorney improperly asked the jury to send a message to the community by convicting him. Although we consider the prosecutor's "thank you" comment to have been, at least, an unnecessary rhetorical flourish, it was not prosecutorial misconduct.

"There is no per se rule against invitations to a jury to 'send a message.'" *United States v. Riley*, 621 F.3d 312, 339 (3d Cir. 2010) (quoting *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 364 n. 9 (3d Cir. 1999)). In the context of a "send the message" comment, we have observed that "[t]he type of counsel misconduct that warrants granting a new trial is not generally a single isolated inappropriate comment, but rather repeated conduct." *Id.* The Government attorney here acted in response to defense counsel's suggestion that the jury should thank Repak for what he had done for Johnstown, *see* JA626 ("[Repak] was one of the best in the state at getting funds. You heard where it is now."), so "the prosecution was only meeting the defense on a level of the defense's own choosing," *United States v. Lore*, 430 F.3d 190, 214 (3d Cir. 2005) (quoting *United States v.*

*LaSorsa*, 480 F.2d 522, 526 (2d Cir. 1973)).  Given the lack of a per se rule prohibiting this type of comment, the isolated nature of the comment, and defense counsel's invitation to such comment, the prosecutor's remark was innocuous.

## IV

For the reasons stated, we will affirm the District Court's judgment of conviction and sentence.